1  JOSEPH E. THOMAS (State Bar No. 101443)
   *jthomas@twtlaw.com*
2  GRANT J. THOMAS (SBN 325011)
   *gthomas@twtlaw.com*
3  **THOMAS WHITELAW & KOLEGRAFF LLP**
   18101 Von Karman Avenue, Suite 230
4  Irvine, California 92612-7132
   Telephone:  (949) 679-6400
5  Facsimile:   (949) 679-6405

6
   Attorneys for Plaintiff Robert Nessler
7

8              UNITED STATES DISTRICT COURT

9      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11 | ROBERT NESSLER, an | **CASE NO.: 2:26-cv-00767** |
   | individual, | |
12 | | |
   | Plaintiff, | |
13 | | **COMPLAINT FOR:** |
   | vs. | **(1) BREACH OF CONTRACT;** |
14 | | **(2) FRAUDULENT INDUCMENT;** |
   | CHECKMATE, INC., a Delaware | **(3) FAILURE TO PAY WAGES AND** |
15 | Corporation; VISHAL | **COMMISSIONS (LABOR CODE § 200 et** |
   | AGARWAL; an individual; DOES | **seq.);** |
16 | 1-10; inclusive. | **(4) VIOLATIONS OF THE FAIR LABOR** |
   | | **STANDARDS ACT 29 U.S.C. § 201 et seq.** |
17 | Defendants. | **(5) WRONGFUL TERMINATION IN** |
   | | **VIOLATION OF LABOR CODE § 98.6;** |
18 | | **(6) WRONGFUL TERMINATION IN** |
   | | **VIOLATION OF PUBLIC POLICY;** |
19 | | **(7) VIOLATION OF SECTION 10(b) OF** |
   | | **THE SECURITIES EXCHANGE ACT OF** |
20 | | **1934;** |
   | | **(8) RETALIATION IN VIOLATION OF** |
21 | | **LABOR CODE § 1102.5;** |
   | | **(9) UNFAIR BUSINESS PRACTICES** |
22 | | **(BUS. & PROF. CODE § 17200 et seq.)** |

**DEMAND FOR JURY TRIAL**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

Plaintiff Robert Nessler ("Plaintiff" or " Mr. Nessler") hereby submits this
Complaint for damages against Checkmate, Inc. ("Checkmate" or "Defendant"),
Mr. Vishal Agarwal ("Agarwal") and DOES 1-10, inclusive (collectively
"Defendants"), based on the following:

## INTRODUCTION

1.      This action arises from an "aquihire" transaction in which Defendants
induced Plaintiff and his cofounders to abandon their independent startup,
surrender their work product, and commit themselves exclusively to Defendant
Checkmate based on inflated valuation claims, promised job security, and
assurances of fair partnership, only for Defendants to later repudiate core
obligations, weaponize indemnification threats, and retaliate when Plaintiff
supported related litigation exposing Defendants' misstatements.

2.      In September 2023, Plaintiff Robert Nessler, together with Arjun
Vasan and Chris Lam, founded Voicebite, Inc., an artificial intelligence technology
company focused on voice AI for restaurant ordering. VoiceBite began building an
automated ordering platform intended to deliver a better-than-human customer
experience using advanced Large Language Models, integrating with restaurants'
existing phone numbers and point-of-sale systems, and deploying quickly at
enterprise scale.

3.      From September 2023 through January 2024, the founders
collaborated to build an initial minimum viable product and prepare it for market.
Mr. Vasan, the only founder with a computer science background, performed the
primary software development work, while Plaintiff and Mr. Lam led business
development and product specification efforts. As the market became increasingly
competitive, VoiceBite lacked the financial resources to accelerate development
and deployment, and the team began seeking a capital partner to supply the
funding and manpower required to bring the product to scale.

4.     In that search, Mr. Vasan began communications with Checkmate through its CEO, Defendant Vishal Agarwal, who introduced the founders to Checkmate's Chief Strategy Officer, Michael Bell, a Los Angeles County resident who acted from California at all relevant times. The parties negotiated an "aquihire" in which Checkmate would hire the VoiceBite team and acquire their existing voice-AI work product in exchange for equity and compensation, allowing Checkmate to expand its product offering and allowing the founders to complete and deploy the technology with adequate resources.

5.     Defendants secured VoiceBite's exclusivity through specific valuation and job-security representations that were material to the founders' decision to proceed. On January 31, 2024, Bell represented in writing that "Checkmate stock is worth $4.67 per share," valuing the equity offered to VoiceBite at approximately $1.5 million, and supplied a spreadsheet listing a "baseline 2023 valuation" of $140 million while promising "generational wealth." Around February 17, 2024, Defendants obtained an exclusive letter of intent supported by these share-valuation representations and by additional assurances of guaranteed employment intended to provide financial stability after the transaction.

6.     After the letter of intent was executed, Defendants' valuation narrative unraveled. It was revealed that a Section 409A valuation dated April 2023 reflected a fair market value of approximately $0.41 per share, materially contradicting Defendants' earlier $4.67 per-share valuation claims. On information and belief, Bell made the $4.67 representation at the direction of Agarwal, with knowledge of its falsity, to inflate the perceived value and success of the transaction and to fraudulently induce the founders into exclusivity and consummation of the aquihire.

7.     Having locked the founders into a no-shop clause that prevented them from pursuing other opportunities, Defendants exploited the resulting leverage to

force acceptance of one-sided terms while the founders continued integrating VoiceBite's technology with Checkmate's platform without compensation. When Plaintiff attempted to ensure transparency and reduce liability risks, Defendants responded with coordinated pressure tactics, including an April 3, 2024, meeting in which Bell angrily resisted disclosure changes, insisted the documents be signed "as presented," and suggested the founders accept the risk of non-disclosure and its consequences. Agarwal simultaneously reassured the founders that indemnification would be handled as partners and that any liability would be capped and shared pro rata, inducing reliance at a critical moment.

8.    Defendants then escalated the coercion surrounding closing. Bell urged the founders to terminate their attorney due to his diligence, conditioned promised back pay on accepting the documents as drafted and characterized sweeping new transaction documents as benign while portraying a newly introduced "IP Letter" as merely a joint-defense mechanism. When counsel warned the founders that the revisions gave Checkmate undue leverage and exposed them to personal and employment-related liability, Bell pressured them to share privileged analysis, resulting in counsel's resignation and leaving the founders scrambling to retain replacement counsel only days before an imposed closing deadline, with insufficient time for meaningful review.

9.    After the merger, Plaintiff's employment continued under an offer letter promising executive compensation and severance protections, and Plaintiff also entered a Bonus Agreement signed by Agarwal that promised substantial additional consideration tied to financing milestones and that governed the form of payment, including potential conversion into Checkmate common stock at $4.67 per share. Defendants later invoked these provisions in a misleading manner, concealed material facts regarding financing structure and valuation, and attempted to force Plaintiff into an inequitable securities transaction by presenting the $4.67

conversion price as accurate despite its disconnect from fair market value and prior 409A valuation metrics, thereby employing deceptive devices in connection with the purchase or sale of securities in violation of Section 10(b) and Rule 10b-5.

10.    When related litigation exposed Defendants' misstatements, Defendants retaliated against Plaintiff and continued the ruse of negotiation to delay enforcement while intensifying pressure and threats. After Plaintiff provided declaration evidence supporting Mr. Vasan's sanctions motion addressing false statements in Checkmate's litigation filings, Agarwal stripped Plaintiff of responsibilities, excluded him from key meetings, demanded pretextual reporting designed to manufacture a paper record of underperformance, and later increased the retaliation after additional corrective testimony. Defendants simultaneously refused to honor payment obligations, withdrew their litigation when advantageous, and ultimately threatened Plaintiff with criminal exposure unless he signed broad waivers and mutual non-disparagement terms, culminating in an explicit refusal to pay wages or bonuses owed unless Plaintiff relinquished all claims.

11.    Checkmate continually made misrepresentation to Mr. Nessler in an attempt to avoid paying what Checkmate rightfully owed to Mr. Nessler and ultimately terminated Mr. Nessler in an attempt to exploit Mr. Nessler's vulnerable position to evade financial and legal responsibility.

## PARTIES

12.    Plaintiff Robert Nessler is and was at the relevant times a resident of Santa Clara County during the actions alleged herein.

13.    Defendant Checkmate.com Inc. is a corporation organized and existing under the laws of the State of Delaware and maintains its principal place of business at 1113 York Avenue, New York, NY 10065.

14.    Defendant Mr. Agarwal is a resident of New York. On information and belief, Mr. Agarwal is a resident of and is domiciled in New York City, New York.

15.    The true names and capacities of Defendants sued herein as DOES 1 through 10 are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and thereon alleges, that each of said fictitiously named Defendants is responsible in some manner for the occurrences alleged herein.

## JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction over Plaintiff's claims under the Fair Labor Standards Act pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b) because the action arises under the laws of the United States. At all relevant times, Defendant was an employer engaged in interstate commerce within the meaning of the Fair Labor Standards Act, and Plaintiff was an employee entitled to the protections of the Act. Plaintiff seeks to recover unpaid wages, liquidated damages, and other relief expressly authorized by the Fair Labor Standards Act, and this Court has jurisdiction to award such relief.

17.    This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as Plaintiff's federal claims under the Fair Labor Standards Act. The state-law claims are so related to the federal claims that they form part of the same case or controversy, and adjudicating them together promotes judicial economy, convenience, and fairness to the parties.

18.    This Court additionally has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.     Plaintiff is a citizen of the State of California and was/is a citizen of California at the time this action commenced. Defendant Checkmate is a citizen of the State Delaware and State of New York at the time this action commenced. Defendant Agarwal was a citizen of the State of New York and was a citizen of New York at the time this action commenced. Therefore, complete diversity exists because Plaintiff is a citizen of California and Defendant is not a citizen of California, and no Plaintiff shares citizenship with any Defendant. Defendant is therefore diverse from the Plaintiff for purposes of 28 U.S.C. § 1332, and this Court has diversity jurisdiction over this action.

20.     The amount in controversy in this action exceeds $75,000 because Plaintiff seeks damages arising from fraud, lost compensation, lost equity value, and related economic harm, as well as equitable relief and attorneys' fees where permitted by law.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

22.     Defendant, acting through its authorized officers and decision-makers, intentionally directed communications, representations, and omissions into this District by means of email, videoconference, telephone, and other electronic communications, knowing that Plaintiff would receive, rely upon, and act on those communications within this District. Venue is also proper in this Court because the Defendant directed communications and actions of agents within Los Angeles, California. The communications and actions were directed at the Plaintiff while he was domiciled in California, and present at meetings within this District. Promises and representations were made to Plaintiff while he was domiciled in California, and present at meetings within this district. The injuries and damages caused by the Defendant and incurred by Plaintiff occurred, in part, in this District.

23.    The misrepresentations and omissions giving rise to Plaintiff's fraud-based claims were transmitted from this District to Plaintiff and others, and into this District to Plaintiff and others, were received and relied upon in this District by Plaintiff and others and caused economic injury that was suffered in this District.

24.    Venue is further proper because key decisions authorizing and ratifying the challenged conduct were directed toward this District, and Defendant purposefully engaged in forum-directed conduct that forms the basis of Plaintiff's claims.

25.    Venue in this District also promotes judicial economy and consistency because a related action arising from the same nucleus of operative facts is currently pending in this District, and adjudicating these closely related disputes in a single forum avoids duplicative proceedings and inconsistent rulings.

## GENERAL ALLEGATIONS

26.    In September of 2023, Mr. Nessler, along with Arjun Vasan and Chris Lam, founded Voicebite, Inc. Voicebite, Inc. was an artificial intelligence technology company focused on voice AI. Voicebite began developing a technology that automates the restaurant ordering process to create what the founders hoped and believed would be a better-than-human experience. The VoiceBite AI solution was built using advanced Large Language Models (LLMs) that power today's AI solutions, giving the VoiceBite AI solution the ability to learn and iterate faster. The VoiceBite AI solution was designed to use the restaurant's existing phone number, integrate with the Point-of-Sale solutions, and get up and running in days.

27.    Between September 2023 and January 2024, VoiceBite's founders, Mr. Nessler, Mr. Vasan and Mr. Lam, worked collaboratively to develop an initial minimum viable product which they hoped to take to market. This product was developed primarily by Mr. Vasan, who was the only founder with computer

science background. The development of the product specifications was aided by

Mr. Nessler and Mr. Lam, whose specialty focused more on business development.

28.     During the development VoiceBite lacked the financial resources to

quickly develop and deploy the product into the marketplace that was increasingly

becoming more competitive and crowded.

29.     Between December 2023 and January 2024, the VoiceBite team began

working to find a capital partner that could supply the necessary capital and

manpower needed to fully develop the Voicebite AI solution.

30.     Within that time, Arjun Vasan began communicating with Defendant

Checkmate through its CEO Defendant Mr. Agarwal. Defendant Agarwal

introduced Mr. Nessler and Mr. Vasan to Checkmate's Chief Strategy Officer,

Michael Bell. Michael Bell was and is a resident of Los Angeles County,

California. At all times, Mr. Bell was present in California during the events

described herein and made all statements and took all actions on behalf of

Checkmate from his home in Los Angeles County, California at the direction of

Defendants.

31.     At all relevant times, Michael Bell acted as an agent, representative,

and managing employee of Defendant Checkmate.com Inc. Bell served as

Checkmate's Chief Strategy Officer and was vested with actual and apparent

authority to negotiate transactions, communicate material representations, and

direct conduct relating to corporate strategy, acquisitions, compensation, and

employment matters on Checkmate's behalf. In undertaking the acts alleged

herein, including making valuation representations, negotiating and enforcing

exclusivity provisions, directing transaction terms, and communicating threats and

conditions relating to compensation and employment, Bell acted within the course

and scope of his agency and for the benefit of Checkmate. Accordingly, Bell's

statements, acts, omissions, and misconduct are properly imputed to Checkmate

under principles of actual authority, apparent authority, ratification, and respondeat superior.

32.    After some discussions, the parties began negotiating terms for an "Aquihire". In this transaction, the VoiceBite team would be hired by Checkmate as employees by Checkmate. Checkmate, in exchange for the labor already performed in creating the VoiceBite AI Solution would obtain the work product already created and employ the individuals to complete the work that had not been finished. This offered benefits to Checkmate in that it allowed Checkmate to expand its product offering to include voice AI technology, and would allow Mr. Nessler, Mr. Vasan and Mr. Lam the financial resources to finish creating the product that would then be deployed on an enterprise scale.

33.    On January 31, 2024, in an email communication, Michael Bell represented that "Checkmate stock is worth $4.67 per share," valuing the equity offered to VoiceBite at approximately $1.5 million. Bell attached a supporting spreadsheet that corroborated this representation by listing Checkmate's "baseline 2023 valuation" at $140 million and projecting future growth, and he further assured the founders that the transaction presented an opportunity to create "generational wealth."

34.    Around February 17, 2024, Defendants secured an exclusive letter of intent with VoiceBite by making representations regarding share valuations and guaranteed job security that played a critical role in the founders' decision to proceed with the transaction.

35.    After the letter of intent was executed, it was revealed that a Section 409A valuation dated April 2023 reflected a fair market value of only $0.41 per share, materially contradicting the valuation representations previously made by Bell.

COMPLAINT

36.     On information and belief, Bell made this representation on behalf and at the direction of Mr. Agarwal. This statement was approved and directed to be sent to Mr. Nessler to fraudulently induce Mr. Nessler, Mr. Vasan and Mr. Lam into entering into an agreement for the "Aquihire" transaction. Mr. Bell directed these statements from his home in Los Angeles County, California. Mr. Agarwal knew these statements were false and directed Mr. Bell to make these statements with knowledge of their falsity. The statements were made with the intent to fraudulently inflate the financial success and value of the transaction to Mr. Nessler, Mr. Vasan, Mr. Lam and the remainder of the VoiceBite team.

37.     In early February 2024, Bell also promised the founders eighteen months of guaranteed employment, representing that this assurance would provide both financial and professional stability following the transaction.

38.     On information and belief, Bell made these representations on behalf and at the direction of Mr. Agarwal. These statements were approved and directed to be sent to Mr. Nessler to fraudulently induce Mr. Nessler, Mr. Vasan and Mr. Lam into entering into an agreement for the "Aquihire" transaction.

39.     This Court has personal jurisdiction over Defendant Checkmate, Inc. because Checkmate, through its agent and managing employee Michael Bell, purposefully directed tortious and unlawful conduct in California and toward Plaintiff, and Plaintiff's claims arise directly out of and relate to that conduct. At all relevant times, Bell acted as Checkmate's Chief Strategy Officer and as a high-level managing agent with authority to negotiate transactions, communicate binding representations, and direct employment and compensation matters on Checkmate's behalf.

40.     While physically present in Los Angeles County, California, Bell made and transmitted material misrepresentations and coercive communications on Checkmate's behalf, including false statements concerning Checkmate's stock

valuation, employment guarantees, compensation terms, and transaction conditions; directives designed to secure exclusivity and induce execution of the Aquihire transaction; interference with Plaintiff's legal representation; and threats and conditions relating to the payment of earned wages and bonuses. Bell's California-based conduct was undertaken at the direction of, and for the benefit of, Checkmate, and was expressly aimed at Plaintiff with the knowledge and intent that its effects would be felt in California.

41.    Bell's actions are attributable to Checkmate under settled agency principles and constitute purposeful availment by Checkmate of the privilege of conducting activities in California. Plaintiff's claims arise out of and are substantially connected to this California-directed conduct, and the exercise of personal jurisdiction over Checkmate therefore comports with due process and traditional notions of fair play and substantial justice.

42.    After execution of the letter of intent, Bell refused to honor the written promises of a full employment term, and Defendant ultimately pressured Plaintiff and his team into accepting only three months of severance instead of the promised employment term.

43.    On or about February 17, 2024, once the letter of intent was signed, a "no shop" clause took effect that required the founders to forego other lucrative opportunities and prevented them from pursuing alternative transactions.

44.    During the period that followed, the founders devoted their full efforts to integrating VoiceBite's technology with Checkmate's platform without receiving compensation, while Defendant used the one-sided exclusivity created by the letter of intent to pressure them into accepting terms that undermined their interests.

45.    On April 3, 2024, during a meeting to discuss final transaction terms, Mr. Bell adopted an aggressive posture in what appeared to be a coordinated "good

cop, bad cop" approach with Agarwal, reacting with visible anger to changes proposed by Plaintiff that were intended to ensure transparency and protect the founders against liability.

46.     During that meeting, Mr. Vasan proposed that some changes in the initial disclosures would need to be made. Mr. Bell asserted that no changes to any disclosures or any part of the drafted agreement could be made by the Voicebite team. Mr. Vasan questioned why Mr. Bell would want the founders to not disclose the legacy code that Mr. Vasan wished to include in the disclosures for the "Aquihire." Bell responded that they would have to risk non-disclosure and its ramifications, and sign the documents as presented, as no changes would be allowed.

47.     At the same meeting, Agarwal reassured the founders that indemnification issues would be handled as partners, omitted discussion of direct personal claim risk, and represented that any liability would be capped at $150,000 and split pro rata among the VoiceBite team.

48.     Following the meeting, the founders debated whether to disclose legacy code issues, citing Bell's hostility to proposed changes and Agarwal's reassurances that the parties were operating as partners.

49.     On April 6, 2024, Bell sent a text message urging the founders to terminate their attorney, Alan Foster, because of his diligence in reviewing the proposed transaction terms.

50.     On April 10, 2024, Bell sent an email conditioning previously promised backpay on the founders' agreement to finalize the transaction documents as they stood, and the founders accepted and confirmed those conditions.

51.     Between April 17 and April 22, 2024, Defendant's counsel transmitted sweeping new transaction documents to the founders via email while

characterizing the changes as benign, and Bell represented that a newly introduced "IP Letter" was intended solely as a joint defense mechanism against potential third-party claims.

52. Between April 22 and April 26, 2024, Foster objected to the revised documents in a memorandum to the founders, warning that the changes provided Checkmate with undue leverage and exposed the founders to personal and employment-related liability.

53. After receiving Foster's memorandum, Bell pressured the founders to share portions of it so that he could understand Foster's concerns. Based on this pressure, Mr. Nessler, Mr. Vasan and Mr. Lam shared this letter in an attempt to save the transaction. After sharing this letter, attorney Foster ultimately resigned in protest, citing Defendant Checkmate's unethical conduct and the jeopardizing of attorney-client privilege.

54. Foster's resignation forced the founders to scramble to secure replacement counsel at the eleventh hour, under circumstances created by Defendant's conduct.

55. On April 26, 2024, replacement counsel was retained only days before an imposed April 30th deadline, leaving minimal time for meaningful legal review, particularly in light of the founders' reliance on promised post-merger salaries and backpay to meet their ongoing financial obligations.

56. This pressure from Mr. Bell caused Mr. Nessler, Mr. Vasan and Mr. Lam to agree to the terms as presented without making the disclosures relating to certain aspects of the legacy code in the system.

57. After the merger, Plaintiff's employment with Checkmate continued pursuant to a written offer letter, which set forth the material terms and conditions of Plaintiff's employment. (Attached hereto as Exhibit A).

58.    The offer letter provided that Plaintiff would hold the title of Vice President and receive an annual base salary of $280,000, together with eligibility for a performance-based bonus of up to $200,000 per year. The letter of the offer also provided Mr. Nessler with 100,000 shares of Checkmate Stock.

59.    The offer letter further provided that if Plaintiff's employment were terminated for any reason, or if Plaintiff resigned for good reason, Plaintiff would be entitled to severance equal to three months of base salary plus one quarter of the annual performance bonus.

60.    In addition to the offer letter, Plaintiff entered into a Bonus Agreement that promised additional consideration in exchange for continued employment, with vesting to occur after three months of service following the merger, on or about August 1, 2024. The Bonus Agreement is signed by both Plaintiff and Defendant Vishal Agarwal. (Attached hereto as Exhibit B).

61.    Under the Bonus Agreement, Defendant agreed to pay Plaintiff an "Initial Payment" of $450,000, which was expressly conditioned on Defendant's completion of a preferred stock financing of at least $7,500,000.

62.    The Bonus Agreement also provided for a "Final Payment" of $50,000, payable on the one-year anniversary of the merger, which was structured to serve as a cap and offset against any indemnification claims asserted against Plaintiff.

63.    The Bonus Agreement entered into by Plaintiff and Checkmate expressly governed the form and timing of payment of any earned Retention Bonus. The Agreement provided that if Checkmate closed a "Qualified Financing" within one year of the date of the Bonus Agreement, then any earned Retention Bonus would be payable in cash no later than ten business days after the later of the Bonus Date or the closing of that financing. The Agreement further provided that if Checkmate did not close a Qualified Financing by the one-year anniversary

date, then any earned Retention Bonus would be payable, at Plaintiff's discretion, either by conversion into Checkmate common stock at a stated price of $4.67 per share or in cash paid in fifteen monthly installments. The Agreement additionally stated that if Plaintiff did not make a timely written election, Checkmate could select the payment method, and that any conversion into stock would be conditioned on execution of a standard stock purchase agreement.

64.     Defendants' subsequent invocation of this payment provision was false and misleading in both statement and application. Although Defendants relied on the contractual reference to a $4.67 per-share conversion price, they failed to disclose, and affirmatively concealed, that the stated price did not reflect the actual fair market value of Checkmate common stock at the time Defendants sought to force conversion. Defendants further failed to disclose that the $4.67 figure was stale, artificial, and disconnected from Checkmate's then-current financial condition, capitalization, operating performance, and risk profile, rendering the purported stock consideration materially overvalued based on the 2023 valuation identified as $0.41 per share.

65.     By presenting the Bonus Agreement's payment clause as if it authorized a neutral and accurate stock conversion at $4.67 per share, Defendants created a misleading impression that Plaintiff would receive stock of equivalent economic value to the earned cash bonus. In reality, Defendants knew or were reckless in not knowing that the stated conversion price materially misrepresented the value of the securities Plaintiff would receive, and that compelling conversion at that price would substantially dilute the true value of Plaintiff's earned compensation.

66.     Defendants' reliance on the contractual payment clause further concealed material facts concerning whether a Qualified Financing had occurred or been structured to avoid triggering the mandatory cash-payment provision, and

whether Defendants had discretionarily manipulated the timing, characterization, or disclosure of financing events to force Plaintiff into an unfavorable securities transaction. Defendants also failed to disclose that the purported "discretion" afforded to Plaintiff under the Agreement was illusory, as Checkmate intended to—and did—unilaterally impose stock consideration at a misleading price while simultaneously asserting unrelated indemnification claims and litigation threats to coerce acceptance.

67.     These misrepresentations and omissions were material because they went directly to the value, nature, and risks of the securities being imposed in exchange for earned compensation. Defendants made the misstatements with scienter, including actual knowledge or deliberate recklessness, and with the intent to reduce Checkmate's cash obligations by substituting overvalued and illiquid securities for wages and bonuses otherwise owed.

68.     Defendants' conduct occurred in connection with the purchase or sale of securities, as Plaintiff was forced to acquire Checkmate common stock pursuant to a purported conversion of earned compensation. Plaintiff reasonably relied on Defendants' representations and omissions because Defendants possessed exclusive control over and access to nonpublic information concerning Checkmate's valuation, financing status, capitalization, and internal assessments of equity value.

69.     As a direct and proximate result of Defendants' deceptive conduct, Plaintiff suffered damages, including receipt of securities worth materially less than represented and the loss of the cash compensation to which Plaintiff was entitled. Defendants' misuse and misrepresentation of the Bonus Agreement's payment provision constituted a deceptive device, scheme, and artifice to defraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

70.    In late July 2024, Agarwal publicly announced through an internal Slack channel accessible to employees that Checkmate had successfully closed a $10,000,000 Series B financing round.

71.    Following that announcement, Agarwal denied that Plaintiff's retention bonus had been triggered, asserting for the first time that the financing had been structured in two separate tranches, an explanation Plaintiff disputed as directly contradicting the plain language of the Bonus Agreement.

72.    In response to Plaintiff's objections, Defendant convened a meeting to address the bonus dispute, during which Agarwal asserted that Defendant's investor, Tiger Global, had suggested the tranche structure for the purpose of delaying bonus payments owed to the VoiceBite team.

73.    During the same meeting, Bell stated that, as a Vice President, Plaintiff should set aside his personal financial interests for the benefit of the company, and Agarwal warned Plaintiff that continued demands for payment, even if contractually justified, could result in Plaintiff's termination.

74.    At that meeting, Agarwal further acknowledged that Defendant had previously assured the VoiceBite team it would be treated fairly if financing fell short, and he proposed accelerating fifty percent of the bonus on an individual, request-only basis, while again urging the team to prioritize the company's interests over their own contractual rights.

75.    On or about October 23, 2024, Defendant publicly announced the successful completion of a $10,000,000 Series B financing round, without disclosing any contingency, tranche structure, or delayed investment arrangement.

76.    Specifically, Checkmate issued a press release that made the following claims: "Checkmate, a leading provider of unified ordering solutions for enterprise restaurants, today announced that it secured $10 million in Series B funding, led by Tiger Global. The round will enable Checkmate to accelerate the

adoption of its voice AI and kiosk technologies across the industry and deliver the custom experience brands need." Further Checkmate stated: "Checkmate offers best-in-class phone ordering and drive-thru AI solutions to some of the country's largest brands, all seamlessly integrated with their POS. The core business is profitable, and this additional round was raised primarily to bring these breakthrough technologies to mid-market and enterprise brands."[1]

77.    In this, Checkmate admitted that hiring the Mr. Nessler, Mr. Vasan and Mr. Lam through the "Aquihire" allowed Checkmate obtain Series B financing in an amount of $10,000,000 to bring what Checkmate refers to as "breakthrough technology" to market.

78.    Defendant Agarwal, Founder and CEO of Checkmate is specifically quoted as stating: "We are at the forefront of bringing voice AI to the restaurant space, given our existing network of customers and POS integrations. With Tiger Global's support, we will continue leading the charge in transforming the restaurant experience." Further, Mr. Agarwal stated: "With this investment, we're doubling down on our development of the technologies that are helping restaurants scale their operations, grow digital revenue, and improve efficiency."[2]

79.    On October 22, 2024, after Mr. Vasan suffered a panic attack during a team meeting, Defendants' representatives issued an ultimatum demanding that Mr. Vasan either accept an immediate demotion or be terminated within twenty-four hours.

80.    At the time the ultimatum was issued, Mr. Vasan was severely overworked and experiencing an acute mental health crisis, and he informed

---

[1] https://www.prweb.com/releases/checkmate-raises-10-million-in-series-b-funding-led-by-tiger-global-to-scale-the-adoption-of-its-restaurant-voice-ai-and-kiosk-solutions-302282963.html
[2] *Id.*

Defendants that he needed medical leave.

81.     Mr. Vasan promptly entered inpatient treatment for severe sleep deprivation, panic attacks, and burnout, and his medical provider completed and submitted medical certification to Defendant Checkmate using Defendant Checkmate's designated form.

82.     At all relevant times, Defendant Checkmate maintained an unlimited paid leave policy as set forth in its Employee Handbook and Mr. Vasan's Offer Letter, and Defendant routinely approved paid leaves for employees at Mr. Vasan's level.

83.     Despite these policies and practices, on October 23, 2024, Defendant's Vice President of Human Resources, Amy Brown, emailed Mr. Vasan characterizing his leave as "unpaid personal leave" and failed to provide any notice of leave rights or options.

84.     On information and belief, on October 25, 2024, Defendant's Strategy Chief, Bell, reorganized Mr. Vasan's team and reassigned Mr. Vasan's direct reports to himself while Mr. Vasan remained on medical leave.

85.     On November 3, 2024, Brown informed Mr. Vasan by email that his pay would cease on November 6 and cited internal security protocols for revoking Mr. Vasan's Slack and Email access, effectively sidelining him from his role while he remained on leave.

86.     Brown did not inform Mr. Vasan of any short-term disability options or alternative benefits that could have supplemented his pay during his medical leave.

87.     Mr. Vasan objected to the characterization of his leave as unpaid and pointed to Defendant's written policies and prior approvals of paid leave for similarly situated employees, but Brown nonetheless insisted that the paid leave policy did not apply to medical leave, contrary to Defendant's Employee

Handbook.

88.     During this same period, Mr. Vasan repeatedly requested updates regarding his overdue partial bonus payment, which Defendant had previously committed to pay.

89.     Bell responded by stating that Defendant would discuss the partial bonus only after Mr. Vasan returned to work, despite Mr. Vasan explaining that he could not return without medical clearance.

90.     Bell did not respond further after Mr. Vasan explained that his ability to return to work depended on his medical provider's approval.

91.     On November 12, 2024, Brown emailed Mr. Vasan notifying him that his leave was now being treated as "unprotected personal leave" and that his health insurance coverage would terminate at the end of the month.

92.     Mr. Vasan protested this decision and offered to seek medical clearance to return on a part-time or modified schedule in order to retain health coverage.

93.     On November 14, 2024, Agarwal scheduled an early-morning Zoom meeting with Mr. Vasan, ostensibly to discuss a reduced work schedule and potential accommodations.

94.     During that meeting, Agarwal instead terminated Mr. Vasan's employment, ending his employment while he was on medical leave and seeking accommodation.

95.     Subsequent to Mr. Vasan's termination, in December of 2024 Plaintiff received only a partial performance bonus payment of approximately $30,000 out of a potential $200,000, and received a modest salary increase from $280,000 to $293,000 following a performance review in which Plaintiff was rated "meets standards" with an overall score of 3 out of 5. Notwithstanding this satisfactory performance evaluation and accompanying raise, Defendants continued to

withhold the substantial remainder of Plaintiff's earned compensation and to treat Plaintiff as underperforming, demonstrating that Defendants' adverse actions and compensation decisions were not based on legitimate performance deficiencies but were instead pretextual and retaliatory in nature.

96.    On January 28, 2025, Mr. Vasan filed the related case *Arjun Vasan v. Checkmate, Inc*. in the Central District of California, Case No. 2:25-cv-00765-MEMF-AS. Hereinafter, this litigation will be referred to as "Vasan Litigation."

97.    After Mr. Vasan filed the Vasan Litigation, Checkmate separately filed a lawsuit against Mr. Vasan in the New York State Court. This case was subsequently removed to Southern District of New York, Case No. 1:25-cv-03181-JMF.

98.    On Jan 28, 2025, Checkmate sent a Notice of Claim to Mr. Nessler, alleging fraud against all the VoiceBite founders as a group—claiming $5M of damages without evidence— and asserting forfeiture of all merger equity and all $1.5 million in unpaid bonuses.

99.    In this way, Checkmate repudiated its obligations under the agreement.

100.    On February 7, 2025, Mr. Nessler responded on behalf of the VoiceBite shareholders identifying that there had been no breach of the agreement and denied Checkmate retained any right to indemnity identified in the January 28, 2025, letter.

101.    On or about May 2025, after Checkmate repudiated the agreement, Mr. Agarwal had a meeting with Mr. Nessler and Mr. Lam. In this meeting, Mr. Agarwal indicated that Checkmate intended to continue to employ both Mr. Nessler and Mr. Lam. Further, Mr. Agarwal identified that Checkmate intended to honor the bonus agreements of both Mr. Nessler and Mr. Lam but could not agree

to payment until a resolution of the issues of both the Vasan Litigation and the Checkmate Litigation had been resolved.

102.    On June 2, 2025, in the Checkmate Litigation, the Honorable Jesse M. Furman of the United States District Court for the Southern District of New York issued a written Proposed Order resolving Defendant's Motion to Dismiss, Transfer, or Stay. After consideration of the motion, the accompanying memorandum of law, the pleadings, and all other papers and proceedings, and upon a finding of good cause, the Court entered a comprehensive order granting dispositive relief against Plaintiff.

103.    In that proposed order, the Court dismissed with prejudice Plaintiff's Second Cause of Action for breach of the purported Non-Competition Agreement pursuant to Federal Rule of Civil Procedure 12(b)(6), expressly finding that the claim was contradicted by documentary evidence submitted by Plaintiff itself. The Court further issued a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, declaring that the Non-Competition Agreement, including its forum selection clause and restrictive covenants, was null, void, and unenforceable as to Defendant because Defendant had been terminated without cause and had not resigned voluntarily.

104.    The Court additionally enjoined Plaintiff from any further assertion or enforcement of the Non-Competition Agreement, or any claim arising from it, against Defendant. Beyond the non-competition claim, the Court dismissed the remainder of the Complaint with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(b)(7), and 19, finding, among other defects, that Plaintiff had failed to allege or satisfy a contractually mandated condition precedent to suit, failed to join indispensable parties whose rights and interests were directly affected by the action, failed to plead or attach the operative agreements with the requisite

specificity, and otherwise failed to state claims upon which relief could be granted or asserted claims barred under applicable law.

105.   In the alternative, the Court ordered that the action be transferred in its entirety to the United States District Court for the Central District of California. In the further alternative, the Court ordered that the action be stayed in favor of a first-filed, procedurally advanced, and more comprehensive action pending in the Central District of California under the first-to-file rule and in the interests of justice and judicial efficiency. In a further alternative disposition, the Court ordered that the action be dismissed without prejudice for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3) and/or for lack of personal jurisdiction pursuant to Rule 12(b)(2), finding that the Complaint failed to establish that venue was proper in the Southern District of New York.

106.   The Court further ordered that, should any portion of the action survive dismissal, Plaintiff was required to file all operative documents upon which its claims were based within fourteen days of the Order. The Court also ordered Plaintiff to show cause within fourteen days as to the factual and legal basis for its use of a Sugar Land, Texas address for service upon Defendant and its subsequent retraction of that address, Plaintiff's failure to disclose, produce, or file with the Court the operative agreements and documents upon which its claims were based, and why the Court should not impose sanctions, draw adverse inferences, or grant other appropriate relief in light of Plaintiff's actions and omissions.

107.   The Court expressly retained authority to grant such other and further relief as it deemed just and proper. The Proposed Order was entered on June 2, 2025, and docketed as Case No. 1:25-cv-03181-JMF.

108.   Immediately prior to the proposed order becoming final, Mr. Vasan filed an additional motion to dismiss resulting in the original order being moot.

109.    On June 3rd, Mr. Nessler sent the following email to Mr. Agarwal to request payment of the bonus in the form of cash rather than stock.

110.    In this June 3rd email, Mr. Nessler stated: "I am writing to formally notify you of my election regarding the payment method for my earned Retention Bonus, as outlined in the Bonus Agreement. In accordance with the terms of the agreement, and since a Qualified Financing has not occurred by the Anniversary Date, I hereby elect to receive the "Initial Payment" and "Final Payment", in cash, to be paid in fifteen (15) monthly installments, without interest, beginning no later than ten (10) business days after this notice has been received by Checkmate. Please confirm receipt of this election within three (3) business days and let me know if any further steps or documentation are required. If I do not hear back, I will assume this election has been accepted according to the Agreement."

111.    Neither Mr. Agarwal nor any Checkmate personnel never responded to this email.

112.    Subsequently, on July 7, 2025, Checkmate voluntarily withdrew the Checkmate litigation.

113.    On July 15, 2025, Mr. Vasan was issued a memorandum of endorsement to file a motion for sanctions against Checkmate for misstatements made in Checkmate's complaint against Mr. Vasan.

114.    On July 25, 2025, Mr. Vasan filed a Motion for Sanctions. Mr. Vasan requested that Mr. Nessler provided declaration evidence to support Mr. Vasan and to address specific misrepresentations made by Checkmate in documents submitted to the court by Checkmate. In this Sanctions Motion, Mr. Vasan filed Mr. Nessler's declaration in support of Mr. Vasan's motion, identifying many false statements made by Checkmate in its complaint against Mr. Vasas in the Checkmate Litigation.

115.    Subsequent to filing this declaration, Mr. Nessler was subject to severe employment retaliation. For example, Following the commencement of Plaintiff's employment in his role overseeing Voice AI initiatives, Defendant Mr. Agarwal engaged in a deliberate course of conduct designed to marginalize Plaintiff, strip him of his responsibilities, and exclude him from core business operations. Beginning in or about this period, Mr. Agarwal abruptly canceled Plaintiff's standing one-on-one meetings, which had previously served as the primary forum for strategic planning, project coordination, and performance alignment. Mr. Agarwal provided no legitimate business justification for canceling these meetings, and their termination effectively cut Plaintiff out of routine leadership communications.

116.    Thereafter, Mr. Agarwal intentionally excluded Plaintiff from meetings, discussions, and planning sessions concerning significant prospective business opportunities, including a potential engagement with Buffalo Wild Wings and the development of a second store project for Popeyes. Despite Plaintiff's role, experience, and direct responsibility for Voice AI strategy, Mr. Agarwal failed to invite Plaintiff to any meetings or communications related to these opportunities, depriving Plaintiff of the ability to contribute expertise, provide guidance, or participate in decisions directly within his purview.

117.    Mr. Agarwal further escalated this exclusionary conduct by expressly refusing to permit Plaintiff to attend the "Voice AI Executive" meeting, notwithstanding the fact that Plaintiff was the most experienced and knowledgeable Voice AI executive within the company. Mr. Agarwal's refusal was categorical and unjustified, and it resulted in key Voice AI decisions being made without the participation of the most qualified individual to advise on the subject matter.

COMPLAINT

118.   At the same time, Mr. Agarwal knowingly undermined and effectively scuttled the Company's Voice AI initiative by pushing Plaintiff out of the project and transferring decision-making authority to individuals with less experience in Voice AI. Mr. Agarwal did so despite knowing that these individuals lacked the technical background, strategic understanding, and industry experience necessary to successfully execute the Voice AI project, thereby jeopardizing the viability of the initiative and diminishing Plaintiff's professional role.

119.   In parallel, Mr. Agarwal repeatedly reassigned Plaintiff's core tasks and responsibilities to overseas workers under Mr. Agarwal's direct control. These reassignments were not based on performance concerns or operational necessity but instead reflected Mr. Agarwal's preference for subordinates who would unquestioningly carry out his directives without scrutiny or independent analysis. As a result, Plaintiff's authority, responsibilities, and influence were systematically eroded, leaving Plaintiff sidelined from meaningful work and deprived of the ability to perform the duties of his position.

120.   Taken together, Mr. Agarwal's actions constituted a sustained and intentional pattern of exclusion, marginalization, and professional undermining, designed to push Plaintiff out of his role and neutralize his contributions to the Company's Voice AI strategy.

121.   After Mr. Agarwal had substantially reduced and reassigned nearly all of Plaintiff's work and responsibilities, Mr. Agarwal began demanding that Plaintiff provide frequent and expedited written updates purporting to identify the work Plaintiff had performed. These demands were made notwithstanding the fact that Mr. Agarwal himself had stripped Plaintiff of meaningful assignments, excluded Plaintiff from meetings, and reassigned Plaintiff's core duties to others.

122.   In or about this same period, Mr. Agarwal required Plaintiff to submit recurring monthly updates describing Plaintiff's role at Checkmate and the

contributions he was allegedly making to the organization. Mr. Agarwal imposed these reporting requirements despite knowing that Plaintiff's role had been intentionally hollowed out and that Plaintiff had been denied the opportunity to perform substantive work consistent with his position, experience, and title.

123.   Mr. Agarwal's insistence on rapid turnaround updates and self-justifying status reports was not tied to any legitimate performance management process and was not imposed on similarly situated executives. Instead, these demands operated as a pretextual paper trail designed to manufacture the appearance of underperformance while Mr. Agarwal simultaneously prevented Plaintiff from performing meaningful work.

124.   By removing Plaintiff's responsibilities and then demanding explanations and documentation for the absence of work, Mr. Agarwal placed Plaintiff in an impossible position and further contributed to the ongoing marginalization and professional undermining that characterized Mr. Agarwal's course of conduct toward Plaintiff at Checkmate.

125.   Despite these retaliatory actions, Checkmate and Mr. Agarwal continued the ruse that Checkmate intended to honor the Bonus Agreement.

126.   For Example, On July 24, 2025, Todd Mutha, acting on behalf of Checkmate, transmitted a written letter to Plaintiff concerning the purported payment and conversion of Plaintiff's earned Retention Bonus under the Bonus Agreement dated April 30, 2024. In that letter, Mutha represented that any Retention Bonus earned would be converted into shares of Checkmate common stock at a fixed price of $4.67 per share, purportedly pursuant to Section 3 of the Bonus Agreement, and further asserted that Checkmate had unilaterally elected that form of payment.

127.   The July 24, 2025, letter affirmatively represented, both expressly and by implication, that the $4.67 per-share figure reflected a valid, accurate, and

enforceable valuation of Checkmate common stock for purposes of converting Plaintiff's earned compensation. That representation was false and misleading at the time it was made. The stated price did not reflect the actual fair market value of Checkmate's common stock, was not based on a bona fide valuation, and was knowingly disconnected from Checkmate's true financial condition, capitalization, and enterprise value as of July 2025.

128.    At the time the letter was sent, Defendants knew, or were deliberately reckless in not knowing, that the $4.67 per-share figure materially overstated the value of Checkmate's common stock and misrepresented the economic reality of the purported stock consideration. Defendants further knew that Plaintiff was being forced into stock consideration rather than cash, and that the stated conversion price would directly determine the number of shares Plaintiff would receive in satisfaction of earned compensation. The misstatement of the stock price was therefore material to Plaintiff's economic decision-making and to the value of the transaction being imposed upon him.

129.    The July 24, 2025, letter also falsely suggested that the conversion price and form of payment were being applied neutrally pursuant to contractual mechanics, while concealing that Checkmate was simultaneously asserting disputed indemnification claims, invoking unrelated litigation, and using the purported stock conversion as leverage in a broader effort to offset, delay, or diminish amounts owed to Plaintiff. By coupling an inflated and misleading stock price with coercive assertions of indemnification and pending litigation, Defendants created a misleading overall impression concerning both the value and legitimacy of the stock consideration being imposed.

130.    Defendants issued the July 24, 2025, letter with scienter, including actual knowledge or reckless disregard of the falsity of the stated stock price, and with the intent to induce Plaintiff to accept, acquiesce in, or be bound by a

transaction that exchanged earned compensation for overvalued and illiquid securities. Defendants further intended to benefit Checkmate by minimizing its cash obligations and by overstating the value of equity used to satisfy compensation liabilities.

131.    Plaintiff reasonably relied on Defendants' representations concerning the purported stock price and valuation, as Defendants possessed superior and exclusive access to information concerning Checkmate's financial condition, capitalization, valuation methodologies, and internal assessments of equity value. Plaintiff had no practical ability to independently verify the accuracy of the $4.67 per-share figure at the time the misrepresentation was made.

132.    As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff suffered economic harm, including but not limited to the loss of cash compensation, receipt of securities worth materially less than represented, and impairment of Plaintiff's ability to obtain the full value of his earned Retention Bonus. Defendants' conduct occurred in connection with the purchase or sale of securities within the meaning of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

133.    Defendants' misstatement of the stock price in the July 24, 2025, letter constituted an intentional scheme to misrepresent material facts and to employ deceptive devices in connection with a securities transaction, in violation of Section 10(b) and Rule 10b-5.

134.    October 23, 2025, Mr. Nessler submitted another signed declaration in the Vasan Litigation to correct false statements made by Checkmate in their case with Mr. Vasan. In this declaration, Mr. Nessler identified that Mr. Varadarajan was not involved in VoiceBite in any capacity. This declaration was filed by Mr. Vasan in the Vasan Litigation on October 31, 2025.

135.   After this October 23, 2025, Declaration, Mr. Agarwal increased the retaliatory actions against Mr. Nessler. For example, Mr. Nessler was no longer allowed to participate in any VoiceBite AI meeting. Mr. Nessler was no longer allowed to communicate with members of the VoiceBite AI team regarding Voice AI products and services offered by a Checkmate. Mr. Nessler was forced to contact other departments and request whether those departments had any assignments or work for Mr. Nessler to perform. Throughout this period, Mr. Nessler was required by Mr. Agarwal to submit weekly reports on his activity at Checkmate despite being excluded from all pervious Checkmate job responsibilities.

136.   On November 19th, Mr. Nessler met with Mr. Agarwal and discussed how to move forward. The parties agreed it was best to part ways amicably and that Mr. Agarwal would get a proposal over to Mr. Nessler shortly regarding the Retention Bonus which was owed to the VoiceBite team. Mr. Nessler stated he would be happy to stay if Mr. Agarwal would listen to his suggestions to improve the product but Mr. Agarwal declined this expertise. On information and belief, this was a tactic to further stall and convince me not to file a lawsuit against Checkmate under the false pretenses of negotiation.

137.   On December 2nd, Mr. Nessler asked Mr. Agarwal for an update on the proposal that was discussed.

138.   On December 2, Mr. Bell threatened Mr. Nessler that if he did not sign a waiver of all claims Mr. Bell, Mr. Agarwal and Checkmate would immediately report Mr. Nessler to the authorities. Specifically, Mr. Bell called Mr. Nessler and said there was no proposal and that their offer was for both of us to sign NDA's and go our separate ways and that Checkmate would not sue Mr. Nessler if he did so and released his claim to the Retention Bonus. Mr. Bell also stated that Mr. Nessler's fraud would subject Mr. Nessler to a criminal

investigation. Thus, Mr. Bell stated there could be criminal implications for failure to sign the mutual NDA and non-disparagement agreement.

139.   Mr. Nessler followed up with Mike Bell via email to confirm these claims.

140.   On December 2nd, Mr. Bell followed up with an email indicating that Checkmate would not pay any wages owed to Mr. Nessler under any agreement and the only would only offer a mutual non-disparagement clause in exchange for a waiver of all claims.

## CLAIM I

### (Breach of Contract Against Checkmate and DOES 1-10)

141.   Plaintiff incorporates by reference the allegations in each and every preceding paragraph as though fully set forth.

142.   Plaintiff and Defendant Checkmate entered into valid, binding, and enforceable contracts, including an Offer Letter and a Bonus Agreement, each of which set forth clear and definite obligations supported by adequate consideration.

143.   Under the Bonus Agreement, Defendant Checkmate agreed to pay Plaintiff a retention bonus consisting of a $450,000 Initial Payment in exchange for Plaintiff's continued employment and services following the merger.

144.   Plaintiff substantially performed all material obligations required of him under the Offer Letter and the Bonus Agreement by remaining employed, performing his duties, and continuing to provide services to Defendant Checkmate despite Defendant Checkmate's persistent undermining of Plaintiff's role and compensation.

145.   Plaintiff remained employed by Defendant Checkmate for at least ninety days following the merger, thereby satisfying the employment-duration condition required to earn the Initial Payment under the Bonus Agreement.

146.    Defendant Checkmate completed a preferred stock financing in excess of $7,500,000, as evidenced by internal announcements and public disclosures stating that Defendant had closed a $10,000,000 Series B financing round.

147.    Defendant Checkmate publicly represented that the Series B financing had been completed without disclosing any contingencies or delayed funding structure that would negate satisfaction of the financing condition set forth in the Bonus Agreement.

148.    Despite Plaintiff's satisfaction of all conditions required to earn the Initial Payment, Defendant Checkmate refused to remit the $450,000 retention bonus owed to Plaintiff under the Bonus Agreement.

149.    Defendant Checkmate's refusal to pay the earned retention bonus constituted a material breach of the Bonus Agreement and deprived Plaintiff of compensation that was contractually guaranteed and fully earned.

150.    Defendant Checkmate breached the implied covenant of good faith and fair dealing inherent in each agreement by engaging in conduct designed to frustrate Plaintiff's ability to receive the benefits of the contracts, including failing to timely establish performance bonus targets and imposing unreasonable and artificial deadlines intended to avoid payment of earned compensation.

151.    Defendant Checkmate also breached the agreements by delaying or withholding back pay and earned bonuses, asserting false accusations against Plaintiff, and engaging in retaliatory conduct that interfered with Plaintiff's contractual rights.

152.    As a direct and proximate result of Defendant Checkmate's breaches of contract, Plaintiff suffered damages including the loss of contractually guaranteed compensation, severance benefits, and bonus payments.

153.    As a direct and proximate result of Defendant's breach, Plaintiff suffered damages in excess of $700,000. Specifically, Plaintiff seeks compensatory

damages in an amount to be proven at trial, including at least $500,000 in retention

bonus compensation and at least $200,000 in performance bonus compensation

that Plaintiff was prevented from earning due to Defendant Checkmate's breaches.

## CLAIM II

### (Fraudulent Inducement Against All Defendants)

154.   Plaintiff incorporates by reference the allegations in each and every

preceding paragraph as though fully set forth.

155.   Agarwal himself and through his agent Michael Bell, made clear,

definite, and material promises and representations to Plaintiff and his co-founders

for the purpose of inducing them to enter into an exclusive letter of intent with

Defendants.

156.   Those representations included assurances that the founders would

receive eighteen months of job security with full compensation if terminated,

providing stability and protection during and after the merger.

157.   Agarwal himself and through his agent Michael Bell, individually and

on behalf of Checkmate, further represented that the founders would receive

approximately $1.5 million in merger equity, consisting of 321,199 shares valued

at $4.67 per share, and that this equity reflected a bona fide and reliable valuation

of Defendant's stock.

158.   Agarwal himself and through his agent Michael Bell, individually and

on behalf of Checkmate, also represented that the founders would receive $1.5

million in guaranteed cash payouts upon the completion of a qualifying financing,

and that those payments were secure and would not be subject to later

renegotiation or discretionary modification.

159.   In addition, Agarwal represented that Defendant Checkmate's

qualifying $10,000,000 Series B financing round was imminent, creating the

impression that the promised cash payments and equity value would be realized in the near term.

160.   At the time these representations were made, Agarwal and Checkmate knew they were false, misleading, or made with reckless disregard for their truth, and they intended that Plaintiff and his co-founders rely on them in deciding whether to proceed with the transaction.

161.   Immediately after securing execution of the exclusive letter of intent, Agarwal and Checkmate retracted the written promise to guarantee eighteen months of employment, demonstrating that the assurance had been made solely to induce execution of the agreement.

162.   Agarwal himself and his agent Bell's assurances that the transaction would create "generational wealth," together with emails and spreadsheets projecting optimistic valuations and growth, materially misrepresented Defendant's financial condition and prospects and sharply contrasted with information known internally to Defendant at the time.

163.   Although the guarantee of $1.5 million in cash payouts was expressly set forth in the letter of intent, Defendants' conduct following execution forced the founders to renegotiate those terms, substantially reducing their leverage and exposing that the guarantee had never been intended to be honored as promised.

164.   Plaintiff and his co-founders reasonably relied on Defendants' promises and representations in entering into the exclusive letter of intent and abandoning alternative courses of action.

165.   In reliance on Defendants' representations, Plaintiff and his co-founders forewent extensive and unsolicited discussions with reputable investors regarding a potential $3 million investment at a $16 million valuation.

166.   Plaintiff and his co-founders also relinquished VoiceBite's independence and future upside in exchange for the promised job stability, equity

value, and career opportunity, knowing that other opportunities would no longer be actively pursued once exclusivity was granted.

167.   As a direct and proximate result of Defendants' misrepresentations and broken promises, Plaintiff and his co-founders terminated fundraising efforts and surrendered VoiceBite's independent negotiating position.

168.   Plaintiff was terminated without ever receiving any of the promised compensation.

169.   Defendant's misrepresentations caused Plaintiff and his co-founders to enter merger negotiations with significantly reduced leverage, resulting in economic harm, lost opportunities, and damages that would not have been suffered absent Defendant's fraudulent inducement.

170.   As a direct and proximate result of Defendant's breach, Plaintiff suffered damages in excess of $700,000.

## CLAIM III

**(Unpaid Wages In Violation of Cal. Labor Code § 200 et seq. Against All Defendants)**

171.   Plaintiff incorporates by reference the allegations in each and every preceding paragraph as though fully set forth.

172.   At all relevant times, Plaintiff was an employee of Defendant Checkmate within the meaning of California Labor Code section 200 and performed labor and services for Defendant Checkmate in exchange for compensation.

173.   California Labor Code section 200 defines wages to include all amounts owed for labor performed, including salaries, bonuses, severance, and other forms of compensation promised as part of the employment relationship.

COMPLAINT

174.   Defendant Checkmate promised Plaintiff compensation in the form of salary, performance bonuses, retention bonuses, severance, and back pay, all of which constituted wages under California law once earned.

175.   Plaintiff earned wages by performing work for Defendant Checkmate, remaining employed for the required vesting periods, and satisfying all conditions necessary to receive the promised compensation.

176.   Defendant Checkmate failed to pay all wages due to Plaintiff in violation of Labor Code §§ 200, 201, 202, 203 and 221.

177.   Defendant Checkmate failed and refused to timely pay Plaintiff earned wages, including retention bonus compensation, performance-based compensation, and other earned remuneration.

178.   Defendant Checkmate improperly conditioned payment of earned wages on future events, discretionary approvals, or Plaintiff's agreement to accept reduced or modified terms, in violation of California Labor Code sections 200 and 204.

179.   Defendant Checkmate delayed payment of wages by asserting post hoc justifications, including purported financing structures, that contradicted Defendant Checkmate's own public announcements and representations and were not authorized by the governing agreements.

180.   Defendant willfully withheld earned wages by refusing to remit the retention bonus after Plaintiff satisfied all vesting and employment requirements and after Defendant publicly announced completion of qualifying financing.

181.   Defendant Checkmate's failure to pay earned wages was knowing and intentional, and not the result of clerical error, inadvertence, or good-faith dispute.

182.   Defendant Checkmate's conduct deprived Plaintiff of timely compensation for labor already performed and forced Plaintiff to continue working while wages were withheld or leveraged to coerce acquiescence.

183.    Defendant Vishal Agarwal is jointly and severally liable for the wage-and-hour violations alleged herein pursuant to California Labor Code section 558.1. At all relevant times, Agarwal was the Founder, Chief Executive Officer, and a managing agent of Checkmate who acted on behalf of the employer and exercised direct control over compensation policies, payment decisions, and the terms and timing of wages and bonus payments owed to Plaintiff. Agarwal personally authorized, directed, and ratified the withholding, delay, and conditioning of Plaintiff's earned wages and bonus compensation, including decisions to substitute equity for cash payment and to condition payment on waivers of rights. By virtue of his active involvement and authority over the unlawful practices, Agarwal is liable as an "other person acting on behalf of an employer" within the meaning of Labor Code section 558.1 and is therefore jointly and severally liable for all wages, penalties, interest, and other relief arising from the violations.

184.    As a direct and proximate result of Defendant Checkmate's violations of California Labor Code section 200 et seq., Plaintiff suffered damages including unpaid wages, delayed compensation, loss of earned income, and related economic harm in excess of $700,000 in unpaid but earned wages.

185.    Plaintiff is entitled to recover unpaid wages, statutory penalties, waiting time penalties, interest, and reasonable attorneys' fees under Labor Code § 218.5.

## CLAIM IV

### (Violations of the Fair Labor Standards Act 29 U.S.C. § 201 et seq. Against Checkmate and DOES 1-10)

186.    Plaintiff incorporates by reference the allegations in each and every preceding paragraph as though fully set forth.

187.   At all relevant times, Defendant Checkmate was an employer engaged in interstate commerce within the meaning of the Fair Labor Standards Act, with annual gross revenues exceeding $500,000 and employees who regularly engaged in interstate communications, transactions, and business activities.

188.   At all relevant times, Plaintiff was an employee of Defendant Checkmate within the meaning of the Fair Labor Standards Act, as Plaintiff performed labor for Defendant, was economically dependent on Defendant for compensation, and worked under Defendant Checkmate's direction and control.

189.   Plaintiff's work was integral to Defendant's business operations and included executive, technical, and integration responsibilities that advanced Defendant's core commercial objectives.

190.   During the relevant period, Plaintiff regularly worked full time and devoted substantial hours to Defendant Checkmate's business, including performing post-merger integration work that directly benefited Defendant Checkmate.

191.   Defendant Checkmate required Plaintiff to perform work for which Plaintiff was not timely and unconditionally paid in cash wages, instead conditioning payment on future events such as financing milestones, discretionary approvals, or execution of additional agreements.

192.   Defendant Checkmate promised compensation for Plaintiff's labor in the form of salary, bonuses, and back pay, but delayed or withheld payment of earned wages while continuing to require Plaintiff to work.

193.   Defendant Checkmate conditioned payment of earned compensation on Plaintiff's agreement to modified terms that were less favorable than those previously promised, including partial bonus acceleration arrangements that reduced and deferred payment of wages already earned.

194.    Defendant Checkmate's practice of deferring, conditioning, or reducing payment of earned compensation constituted a failure to pay wages when due in violation of the Fair Labor Standards Act.

195.    To the extent Defendant Checkmate attempted to substitute contingent or speculative compensation for guaranteed wages, including by tying in compensation to financing events or future anniversaries, such practices violated the Fair Labor Standards Act's requirement that employees be paid minimum wages and overtime in cash or cash-equivalent compensation when earned.

196.    Plaintiff did not qualify for any exemption under the Fair Labor Standards Act, or, in the alternative, Defendant Checkmate cannot meet its burden to establish that Plaintiff was properly classified as exempt because Plaintiff was not paid on a guaranteed salary basis free from improper deductions or contingencies.

197.    Plaintiff complained to Defendant Checkmate about the failure to honor compensation obligations and the withholding of earned pay, thereby engaging in protected activity under the Fair Labor Standards Act.

198.    After Plaintiff raised objections regarding unpaid compensation and sought enforcement of his wage rights, Defendant Checkmate threatened adverse employment action, including termination, if Plaintiff continued to assert his contractual and statutory rights in violation of 29 U.S.C. § 215(a)(3).

199.    Defendant Checkmate warned Plaintiff that further demands for payment, even if rightful, could result in Plaintiff's dismissal, and used the threat of termination to coerce Plaintiff into accepting reduced or delayed compensation.

200.    Defendant Checkmate's threats, coercion, and conditioning of continued employment and compensation on Plaintiff's silence or acquiescence constituted unlawful retaliation and interference with rights protected by the Fair Labor Standards Act.

201.   As a direct and proximate result of Defendant Checkmate's violations of the Fair Labor Standards Act, Plaintiff suffered damages including unpaid wages, delayed compensation, loss of guaranteed earnings, and related economic harm.

202.   As a direct and proximate result of Defendant Checkmate's breach, Plaintiff suffered damages in excess of $700,000.

203.   Defendant's violations were willful, knowing, or reckless, entitling Plaintiff to recover liquidated damages, attorneys' fees, costs, and all other relief available under the Fair Labor Standards Act pursuant to 29 U.S.C. § 216(b).

## CLAIM V

### (Wrongful Termination In Violation California Labor Code Section § 98.6 Against Checkmate and DOES 1-10)

204.   Plaintiff incorporates by reference the allegations in each and every preceding paragraph as though fully set forth.

205.   At all relevant times, Plaintiff was an employee of Defendant Checkmate.com Inc. ("Checkmate") and was entitled to the protections of California Labor Code section 98.6, which prohibits an employer from discharging, discriminating, or retaliating against an employee because the employee engaged in protected conduct, including asserting rights under the Labor Code and complaining about or seeking payment of wages and other compensation owed.

206.   Plaintiff engaged in protected activity when he complained internally, in good faith, about Checkmate's failure and refusal to pay compensation owed to him, including but not limited to earned retention bonus compensation and associated amounts that Plaintiff contended were due and payable under written agreements. Plaintiff further engaged in protected activity when he objected to and challenged Checkmate's efforts to withhold earned compensation, delay payment,

or condition payment on waiver of rights and claims, and when he formally communicated his election to receive payment in cash pursuant to the governing bonus terms.

207.   Plaintiff also engaged in protected activity when he provided truthful information and evidence concerning Checkmate's compensation practices and related misconduct, including submitting declarations and cooperating with proceedings arising from or related to Checkmate's disputes over compensation and employment-related obligations. Plaintiff's provision of truthful evidence and cooperation in such matters constituted protected conduct, including conduct analogous to participating in or assisting with enforcement of rights relating to wages and employment protections.

208.   Defendants were aware of Plaintiff's protected activity. Plaintiff's objections, requests for payment, election communications, and related supporting declarations were communicated directly to Checkmate decisionmakers, including Defendant Vishal Agarwal and Defendant Michael Bell, and were discussed within the leadership group responsible for employment decisions affecting Plaintiff.

209.   After Plaintiff engaged in protected activity, Defendants subjected Plaintiff to adverse employment actions and discriminatory treatment. Beginning shortly after Plaintiff's protected conduct and escalating thereafter, Defendant Agarwal initiated a deliberate course of conduct to marginalize Plaintiff, strip him of responsibilities, and exclude him from core business operations, including canceling Plaintiff's standing one-on-one meetings, excluding Plaintiff from planning sessions and meetings for significant prospective clients, and refusing to allow Plaintiff to attend the "Voice AI Executive" meeting despite Plaintiff's seniority and subject-matter expertise.

210.   Defendants further retaliated against Plaintiff by reassigning Plaintiff's substantive work away from him and transferring decision-making

authority to less qualified personnel, while simultaneously removing Plaintiff's access to the Voice AI team and preventing Plaintiff from performing the duties of his role. Defendants reassigned Plaintiff's tasks to overseas workers under Defendant Agarwal's direct control and otherwise deprived Plaintiff of meaningful work and professional standing within the organization.

211. After Defendants had hollowed out Plaintiff's role, Defendants compounded the retaliation by demanding that Plaintiff provide rapid and recurring written updates purporting to identify work performed and to describe Plaintiff's "role" at Checkmate on a monthly and, later, weekly basis, despite Defendants' intentional exclusion of Plaintiff from the work needed to generate substantive accomplishments. These demands were not part of any legitimate performance process and were imposed in a manner designed to manufacture a paper record of purported underperformance as a pretext for further adverse action.

212. Defendants' retaliatory campaign intensified after Plaintiff provided declaration evidence and other truthful information in connection with proceedings addressing Checkmate's misstatements and compensation-related disputes. Following Plaintiff's cooperation, Defendants escalated the isolation by barring Plaintiff from Voice AI meetings entirely, forbidding Plaintiff from communicating with members of the Voice AI team, and forcing Plaintiff to seek work assignments from unrelated departments while continuing to demand weekly reports regarding activities Defendants had made impossible to perform.

213. Defendants' retaliatory conduct also included threats and coercion intended to deter Plaintiff from exercising rights and pursuing earned compensation. For example, Defendants communicated that Checkmate would not pay amounts owed unless Plaintiff executed broad waivers of claims and agreed to mutual non-disparagement and confidentiality restrictions, and Defendants threatened Plaintiff with being reported to authorities and subjected to criminal

investigation if he did not sign away his rights. These threats were made to chill protected activity and to punish Plaintiff for insisting on payment of earned compensation and for providing truthful information in employment-related proceedings.

214.    The timing and circumstances of Defendants' actions demonstrate a causal connection between Plaintiff's protected activity and the adverse employment actions. Plaintiff's exclusion from responsibilities, imposition of pretextual reporting burdens, intensified isolation, and coercive threats occurred shortly after, and in direct response to, Plaintiff's complaints about unpaid compensation, insistence on his contractual and statutory rights to payment, and cooperation in matters exposing Defendants' misconduct.

215.    As a direct and proximate result of Defendants' retaliation in violation of California Labor Code section 98.6, Plaintiff has suffered damages, including lost compensation and benefits, impairment of career and professional standing, emotional distress, and other consequential harms. Plaintiff is entitled to all remedies available under California law, including but not limited to lost wages and benefits, interest, penalties where applicable, and attorneys' fees and costs as permitted.

216.    As a direct and proximate result of Defendant's breach, Plaintiff suffered damages in excess of $700,000.

217.    Plaintiff is entitled to recover unpaid wages, statutory penalties, waiting time penalties, interest, and reasonable attorneys' fees under Labor Code § 218.5.

## CLAIM VI

## (Wrongful Termination in Violation of Public Policy Against Checkmate and DOES 1-10)

218.   Plaintiff incorporates by reference the allegations in each and every preceding paragraph as though fully set forth.

219.   At all relevant times, Plaintiff was employed by Defendant Checkmate and performed his duties competently and in good faith.

220.   California has a fundamental public policy, embodied in its statutes and common law, that prohibits employers from terminating employees for asserting statutory wage rights, refusing to participate in unlawful conduct, or objecting to fraudulent or deceptive business practices.

221.   Plaintiff engaged in protected activity by asserting his right to be paid earned wages and bonuses, objecting to Defendant Checkmate's withholding and conditioning of compensation, and insisting that Defendant Checkmate honor written promises regarding compensation, severance, and employment security.

222.   Plaintiff further engaged in protected activity by questioning and refusing to acquiesce in conduct that would require him to misrepresent facts, conceal material information, or sign agreements that he reasonably believed were false, misleading, or unlawful.

223.   Defendant Checkmate was aware that Plaintiff had asserted these rights and objections and that Plaintiff's conduct was protected by well-established public policy.

224.   After Plaintiff asserted his rights and raised objections regarding unpaid compensation, misleading representations, and improper pressure tactics, Defendant Checkmate subjected Plaintiff to hostility, threats, and retaliation, including warnings that continued demands for payment or insistence on lawful conduct could result in termination.

225.   Defendant Checkmate expressly threatened Plaintiff with termination for continuing to pursue compensation to which he was contractually and statutorily entitled, even if those demands were rightful.

226.   Defendant Checkmate ultimately terminated Plaintiff's employment because Plaintiff refused to abandon his wage claims, refused to subordinate his legal rights to Defendant Checkmate's financial interests, and refused to participate in or condone misleading or unlawful conduct.

227.   Plaintiff Checkmate's termination was not based on performance, misconduct, or legitimate business reasons, but was instead motivated by Defendant Checkmate's desire to silence Plaintiff, avoid paying earned compensation, and retaliate against Plaintiff for asserting protected rights.

228.   Defendant Checkmate's termination of Plaintiff under these circumstances violated fundamental public policies protecting employees who assert wage rights, who refuse to engage in fraud or deception, and who seek to ensure compliance with California labor and employment laws. Defendants' acts and omissions, including but not limited to discharging, threatening, marginalizing, excluding, and otherwise discriminating against Plaintiff because Plaintiff opposed practices forbidden under the California Fair Employment and Housing Act and because Plaintiff complained of, testified about, and assisted in proceedings concerning Defendants' unlawful conduct, constitute unlawful retaliation in violation of California Labor Code Section 1102.5California Government Code section 12940(h).

229.   As a direct and proximate result of the wrongful termination, Plaintiff has suffered lost wages, lost benefits, emotional distress, and other damages.

230.   Plaintiff's termination was retaliatory and violated fundamental California public policies protecting employees' rights to assert wage claims and to be free from retaliation for exercising such rights.

231.   Defendant Checkmate's conduct caused Plaintiff to suffer lost income, emotional distress, reputational harm, and other consequential damages.

232.   As a direct and proximate result of Defendant Checkmate's breach, Plaintiff suffered damages in excess of $700,000.

233.   Plaintiff is entitled to recover unpaid wages, statutory penalties, waiting time penalties, interest, and reasonable attorneys' fees under Labor Code § 218.5.

## CLAIM VII

## (Violation of Section 10(b) of the Securities Exchange Act of 1934 Against All Defendants)

234.   Plaintiff incorporate by reference the allegations in each and every preceding paragraph as though fully set forth.

235.   Defendants, directly and through their officers, executives, and authorized agents, engaged in a scheme to defraud Plaintiff in connection with the offer and sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, codified at 17 C.F.R. § 240.10b-5.

236.   The securities at issue consisted of equity interests offered to Plaintiff as merger consideration and as compensation for continued employment, which constituted "securities" within the meaning of the Securities Exchange Act of 1934 and were offered and sold to Plaintiff in exchange for labor, services, and the relinquishment of alternative investment and employment opportunities.

237.   Defendants made untrue statements of material fact and omitted material facts necessary to make their statements not misleading, in connection with the offer and inducement of Plaintiff to accept equity-based consideration and to perform labor and services in reliance on that equity.

238.   Defendants represented to Plaintiff that the equity offered in connection with the transaction was worth approximately $1.5 million, calculated as 321,199 shares valued at $4.67 per share, and presented that valuation as a current and reliable statement of fact rather than as a speculative projection or opinion.

239.   Defendants further represented that qualifying financing of at least $10,000,000 was imminent and that such financing would validate the stated valuation and trigger guaranteed cash payouts, while failing to disclose material facts concerning the true status, structure, contingencies, and risks associated with the financing.

240.   At the time these representations were made, Defendants possessed non-public, contemporaneous information contradicting the claimed valuation and financing certainty, including information concerning prior valuations, dilution risk, financing uncertainty, and internal assessments that materially undermined the accuracy of the representations made to Plaintiff.

241.   Defendants knew, or were deliberately reckless in not knowing, that the representations concerning valuation, guaranteed payouts, and imminent financing were false or misleading when made, thereby satisfying the scienter requirement under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

242.   Defendants acted with intent to deceive, manipulate, or defraud Plaintiff by presenting speculative or unsupported valuation figures as present fact, by omitting material adverse information uniquely within Defendants' possession and control, and by inducing Plaintiff to exchange labor and forego alternative transactions based on those misrepresentations.

243.   Defendants' misstatements and omissions were material because a reasonable investor in Plaintiff's position would have considered the true valuation methodology, financing status, and risk profile important in deciding whether to

accept the equity offered, to enter into exclusivity, or to continue providing labor and services in lieu of pursuing other opportunities.

244.   Plaintiff reasonably relied on Defendants' misrepresentations and omissions by entering into the exclusive transaction, accepting equity-based compensation in lieu of alternative cash compensation or investment opportunities, and continuing to provide labor and services to Defendants under the belief that the representations were truthful and complete.

245.   Plaintiff's reliance was reasonable because Defendants held superior access to material information concerning valuation, financing, and corporate prospects, and because Defendants presented their representations as statements of present fact rather than contingent or speculative projections.

246.   Plaintiff suffered economic loss as a direct and proximate result of Defendants' violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, including loss of the benefit of the bargain, loss of alternative investment and employment opportunities, uncompensated labor, and diminution in the value of the securities offered.

247.   Plaintiff's losses were caused by Defendants' fraudulent conduct because the truth regarding valuation, financing, and risk, when revealed through Defendants' subsequent conduct and disclosures, rendered the securities and compensation materially less valuable than represented at the time of the transaction, thereby establishing loss causation under federal securities law.

248.   Defendants are liable under 17 C.F.R. § 240.10b-5(a), (b), and (c) because they employed a device, scheme, and artifice to defraud, made untrue statements of material fact and omitted material facts, and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiff in connection with the offer and sale of securities.

249.   As a direct and proximate result of Defendant's breach, Plaintiff suffered damages in excess of $700,000.

250.   Defendants' conduct constitutes actionable securities fraud for which Plaintiff seeks all relief available under the Securities Exchange Act of 1934, including compensatory damages, recessionary relief, interest, attorneys' fees where permitted, and such further relief as the Court deems just and proper.

## CLAIM VIII

### (Retaliation in Violation of California Labor Code § 1102.5 Against Checkmate and DOES 1-10)

251.   Plaintiff incorporates by reference the allegations in each and every preceding paragraph as though fully set forth.

252.   At all relevant times, Plaintiff was an employee of Defendant Checkmate and performed his duties competently and in good faith.

253.   California Labor Code section 1102.5 embodies a fundamental public policy that prohibits employers from retaliating against employees for disclosing information, objecting to conduct, or refusing to participate in activities that the employee reasonably believes violate state or federal law.

254.   Plaintiff engaged in protected activity by disclosing to Defendant Checkmate, and by objecting internally, that Defendant Checkmate was withholding earned compensation, conditioning payment of wages on improper contingencies, and making representations regarding compensation and financing that Plaintiff reasonably believed were false or misleading.

255.   Plaintiff further engaged in protected activity by refusing to acquiesce in conduct that would require him to misrepresent facts, conceal material information, or sign documents that he reasonably believed were deceptive, unlawful, or designed to evade wage and labor obligations.

256.    Plaintiff also engaged in protected activity by asserting his right to receive earned wages and bonuses, by questioning Defendant Checkmate's refusal to honor written compensation commitments, and by raising concerns that Defendant Checkmate's conduct violated California labor laws and public policy.

257.    Defendant Checkmate was aware that Plaintiff had engaged in these protected activities and that Plaintiff's objections and disclosures concerned potential violations of law.

258.    After Plaintiff engaged in protected activity, Defendant Checkmate subjected Plaintiff to hostility, threats, and adverse treatment, including warnings that continued demands for compensation or objections to Defendant Checkmate's conduct could result in termination.

259.    Defendants subjected Plaintiff to unlawful retaliation in violation of California Labor Code section 1102.5 after Plaintiff disclosed, opposed, and refused to participate in conduct that Plaintiff reasonably believed violated state and federal law. Plaintiff raised concerns regarding Defendants' misrepresentations about compensation, valuation, and financing, objected to Defendants' withholding and conditioning of earned wages and bonuses, and provided truthful information and evidence in connection with proceedings addressing Defendants' unlawful practices. Plaintiff's disclosures and opposition were made in good faith and were directed to persons with authority to investigate or correct the violations, including senior executives and counsel, and to forums and proceedings protected by statute.

260.    Following Plaintiff's protected disclosures and refusal to participate in unlawful conduct, Defendants engaged in a deliberate course of retaliatory conduct designed to punish Plaintiff and deter further whistleblowing. Defendants stripped Plaintiff of core responsibilities, excluded him from meetings and strategic planning sessions central to his role, reassigned his duties to less qualified individuals, and barred him from participating in Voice AI initiatives for which he

was uniquely qualified. Defendants further imposed pretextual and burdensome reporting requirements after eliminating Plaintiff's ability to perform substantive work, creating an artificial record of alleged underperformance while isolating Plaintiff from meaningful employment.

261.   Defendants' retaliatory actions escalated after Plaintiff assisted in proceedings and provided sworn testimony exposing Defendants' misstatements and misconduct. Defendants intensified Plaintiff's isolation, threatened adverse consequences unless Plaintiff abandoned his claims, and conditioned payment of earned compensation on Plaintiff's execution of sweeping waivers and non-disparagement agreements. The close temporal proximity between Plaintiff's protected activity and Defendants' adverse actions, together with Defendants' threats and shifting justifications, establishes a causal connection between Plaintiff's whistleblowing and the retaliation, in violation of California Labor Code section 1102.5.

262.   Defendant Checkmate expressly threatened Plaintiff with termination if Plaintiff continued to assert his rights or pursue payment of compensation to which he reasonably believed he was legally entitled.

263.   Defendant Checkmate subsequently terminated Plaintiff's employment because Plaintiff disclosed, objected to, and refused to participate in conduct that he reasonably believed violated California labor laws and other legal obligations.

264.   Plaintiff's protected activity was a contributing factor in Defendant Checkmate's decision to terminate his employment, and Defendant's actions were motivated, at least in part, by retaliation.

265.   Defendant Checkmate's stated reasons for terminating Plaintiff were pretextual and were not the true motivating factors for the adverse employment action.

266.   As a direct and proximate result of Defendant Checkmate's retaliatory conduct, Plaintiff suffered damages including lost wages, lost bonus compensation, loss of employment-related benefits, and other economic and non-economic harm. These violations are estimated to be excess of $700,000.

267.   Defendant Checkmate's retaliation was willful, wanton, and in conscious disregard of Plaintiff's statutory rights, entitling Plaintiff to recover compensatory damages, civil penalties, injunctive relief, and reasonable attorneys' fees and costs under Labor Code §§ 1102.5(j).

## CLAIM IV

### (Unfair Business Practices In Violation of Cal. Bus. & Prof. Code § 17200 et seq. Against Checkmate and DOES 1-10)

268.   Plaintiff incorporates by reference the allegations in each and every preceding paragraph as though fully set forth.

269.   Defendant Checkmate's fraudulent misrepresentations, failure to pay earned wages, and retaliatory conduct constitute unlawful, unfair, and fraudulent business practices in violation of Business & Professions Code § 17200.

270.   Specifically, Defendant Checkmate's conduct violated Labor Code Sections 200, 201, 202, 203, 204, 218.5 and California Penal Code Section 487m.

271.   Plaintiff was harmed by Defendant Checkmate's violations of these labor and penal code sections.

272.   Plaintiff seeks restitution for all unpaid wages and commissions, disgorgement of ill-gotten gains, injunctive relief and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. That judgment be entered in favor of Plaintiff and against Defendant;
2. That Plaintiff be awarded damages against Defendant for all Causes of

Action, subject to proof at trial:

    a.  First CLAIM: subject to proof at trial, but not less than $700,000;

    b.  Second CLAIM: subject to proof at trial, but not less than $700,000;

    c.  Third CLAIM: subject to proof at trial, but not less than $700,000;

    d.  Fourth CLAIM: subject to proof at trial, but not less than $700,000;

    e.  Fifth CLAIM: subject to proof at trial, but not less than $700,000;

    f.  Sixth CLAIM: subject to proof at trial, but not less than $700,000;

    g.  Seventh CLAIM: subject to proof at trial, but not less than $700,000;

    h.  Eighth CLAIM: subject to proof at trial, but not less than $700,000;

    i.  Ninth CLAIM: restitution and/or disgorgement subject to proof;

3.  For unpaid wages and commissions;

4.  For waiting time penalties under Labor Code §§ 203, 218.5, and 1102.5(j);

5.  For liquidated damages under Labor Code §§ 203, 218.5, and 1102.5(j);

6.  For statutory damages;

7.  For punitive damages in an amount sufficient to punish and deter Defendant's misconduct;

8.  For restitution and disgorgement under Business & Professions Code

§ 17200;

9.  For pre- and post-judgment interest as provided by law;

10. For reasonable attorneys' fees and costs of suit incurred herein;

11. For injunctive relief to prevent ongoing unlawful conduct; and

12. For such other and further relief as the Court may deem just and proper.

DATED:  January 26, 2026          THOMAS WHITELAW & KOLEGRAFF LLP


By:    _____/s/ Joseph E. Thomas_____
       JOSEPH E. THOMAS
       GRANT J. THOMAS
       Attorneys for Plaintiff

COMPLAINT