EXHIBIT C

Confidential

AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER is made and entered into as of April 30, 2024, by and among Checkmate.com Inc., a Delaware corporation ("Purchaser"), VoiceBite Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of Purchaser ("Merger Sub"), VoiceBite Corporation, a Delaware corporation (the "Company"), Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia (each a "Stockholder" and collectively the "Stockholders"), and Robert Nessler as representative of the Pre-Closing Holders (the "Holder Representative").

RECITALS

A.    Each of Purchaser, Merger Sub and the Company believe it advisable and in the best interests of each corporation and company and their respective stockholders that Purchaser and the Company enter into a business combination transaction in accordance with the Delaware General Corporation Law (the "DGCL") pursuant to which Merger Sub will merge with and into the Company with the Company surviving that merger on the terms and subject to the conditions set forth herein (the "Merger") and, in furtherance thereof, have approved this Agreement and the Merger.  The parties intend that the Merger qualifies as a "reorganization" within the meaning of Section 368(a)(2)(E) of the Internal Revenue Code.

B.    Immediately prior to the execution of this Agreement, the Company has obtained, in accordance with Section 228 of the DGCL, a written consent of its stockholders approving this Agreement, the Merger and the transactions contemplated hereby in accordance with Section 251 of the DGCL.

C.    Purchaser, Merger Sub and the Company desire to make certain representations, warranties, covenants and agreements in connection with the Merger and to prescribe various conditions to the Merger.

D.    Simultaneously with the execution and delivery of this Agreement, and as a condition and inducement to Purchaser to enter into this Agreement, certain employees of the Company have entered into employment arrangements with Purchaser or a Subsidiary thereof to become effective at the Effective Time.

Accordingly, the parties to this Agreement, intending to be legally bound, agree as follows:

SECTION 1
DEFINED TERMS; RULES OF CONSTRUCTION

Section 1.1    Definitions.  In addition to the terms defined elsewhere herein, the following terms have the meanings set forth below:

"Acquisition Transaction" means any transaction or series of related transactions involving (a) any merger, consolidation, share exchange, business combination, recapitalization, tender offer, exchange offer or similar transaction involving the Company; (b) any sale, lease, exchange, transfer, license, acquisition or disposition of a substantial portion of the business or assets of the Company; or (c) any issuance, sale or acquisitions of a substantial amount of securities or other equity interests of any of the Company.

"Affiliate" means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by or under common control with such Person.

"Agreement" means this Agreement and Plan of Merger, as amended from time to time.

"Antitrust Laws" means any applicable Law that is designed or intended to prohibit, restrict or regulate foreign investment or actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or otherwise, including the Sherman Antitrust Act, the Clayton Antitrust Act, the HSR Act and the Federal Trade Commission Act.

"Available Cash" means cash on the Company's balance sheet immediately prior to Closing.

"Business Day" means any day except Saturday, Sunday or a day on which banks are generally not open for business in New York, New York.

"Closing Shares" means the Merger Consideration.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Stock" means the common stock, par value $0.00001 per share, of the Company.

"Company Benefit Plan" means each Employee Benefit Plan sponsored or maintained or required to be sponsored or maintained at any time by the Company or to which the Company makes or has made, or has or has had an obligation to make, contributions at any time, or with respect to which the Company has any liability or obligation.

"Company Disclosure Schedule" means the disclosure schedule delivered to Purchaser on behalf of the Company on, and dated as of, the date of this Agreement.

"Company Intellectual Property" means all Intellectual Property owned by, licensed to or used by the Company.

"Company Proprietary Software" means all Software owned by the Company.

"Company Registered Intellectual Property" means all of the Registered Intellectual Property owned by or filed in the name of the Company.

"Company Related Agreement" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by the Company in connection with the transactions contemplated hereby.

"Company Transaction Expenses" means the sum of (a) all fees, costs and expenses (including legal, accounting and financial advisor fees and expenses) that are incurred by or for the benefit of the Company through the Closing Date in connection with the transactions contemplated by this Agreement (whether or not already paid), and (b) all sale, change of control, severance or similar bonuses and amounts that will or may become payable by or on behalf of the Company in connection with or as a result of the consummation of the transactions contemplated by this Agreement.

"Confidential Information" means any data or information concerning the Company (including trade secrets), without regard to form, regarding (for example and including) (a) business process models, (b) proprietary software, (c) research, development, products, services, marketing, selling, business plans, budgets, unpublished financial statements, licenses, prices, costs, Contracts, suppliers, customers, and customer lists, (d) the identity, skills and compensation of employees, contractors, and consultants, (e) specialized training or (f) discoveries, developments, trade secrets, processes, formulas, data, lists, and all

other works of authorship, mask works, ideas, concepts, know-how, designs, and techniques, whether or not any of the foregoing is or are patentable, copyrightable, or registrable under any intellectual property Laws or industrial property Laws in the United States or elsewhere. Notwithstanding the foregoing, no data or information constitutes "Confidential Information" if such data or information is publicly known and in the public domain through means that do not involve a breach by the Company of any covenant or obligation set forth in this Agreement.

"Contract" means any written or oral agreement, contract, subcontract, lease, understanding, instrument, note, warranty, license, sublicense, insurance policy, benefit plan or legally binding commitment or undertaking of any nature, whether express or implied.

"Controlled Group Liability" means any and all liabilities (a) under Title IV of ERISA, (b) under Section 302 of ERISA, (c) under Sections 412 and 4971 of the Code or (d) resulting from a failure to comply with the continuation coverage requirements of Section 601 et. seq. of ERISA and Section 4980B of the Code.

"Dissenting Shares" means shares held by Pre-Closing Holders who object to the Merger and comply with the applicable provisions of the DGCL concerning the rights of Pre-Closing Holders to dissent from the Merger and require appraisal of their shares.

"Employee Benefit Plan" means, with respect to any Person, each plan, fund, program, agreement, arrangement or scheme, including each plan, fund, program, agreement, arrangement or scheme maintained or required to be maintained under applicable Laws, that promises or provides compensation or benefits of any kind to any current or former employee, director, manager, officer, consultant, independent contractor, contingent worker or leased employee of such Person or an Affiliate of such Person or the beneficiaries or dependents of any of them (whether written or oral), including (i) each deferred compensation, bonus, incentive compensation, pension, retirement, employee stock ownership, stock purchase, stock option, profit sharing or deferred profit sharing, stock appreciation, phantom stock plan and other equity compensation plan, "welfare" plan (within the meaning of Section 3(1) of ERISA, determined without regard to whether such plan is subject to ERISA), (ii) each "pension" plan (within the meaning of Section 3(2) of ERISA, determined without regard to whether such plan is either subject to ERISA or is tax-qualified under the Code) and (iii) each severance plan or agreement, and each other plan providing health, vacation, supplemental unemployment benefit, hospitalization insurance, medical, dental, disability, life insurance, death or survivor benefits, fringe benefits or legal benefits.

"Encumbrance" means any lien, pledge, hypothecation, charge, mortgage, security interest, encumbrance, claim, infringement, interference, option, right of first refusal, preemptive right, community property interest or restriction of any nature affecting property, real or personal, tangible or intangible, including any restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the receipt of any income derived from any asset, any restriction on the use of any asset, any restriction on the possession, exercise or transfer of any other attribute of ownership of any asset, any lease in the nature thereof and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statute of any jurisdiction).

"Entity" means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any Person that together with the Company would be deemed a "single employer" within the meaning of Section 414 of the Code.

"ERISA Affiliate Plan" means each Employee Benefit Plan sponsored or maintained or required to be sponsored or maintained at any time by any ERISA Affiliate, or to which such ERISA Affiliate makes or has made, or has or has had an obligation to make, contributions at any time, or with respect to which such ERISA Affiliate has any liability or obligation.

"Fraud" means common law fraud under the laws of the State of Delaware.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Authorization" means any approval, permit, license, certificate, franchise, permission, clearance, registration, qualification or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"Governmental Body" means any (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature, (b) federal, state, local, municipal, foreign, supranational or other government or (c) governmental, self-regulatory or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Entity and any court or other tribunal).

"Group Company" means the Company and each of its Subsidiaries.

"Holder Allocable Expenses" means the aggregate amount of the fees and expenses that may be incurred by the Holder Representative in its capacity as Holder Representative under this Agreement on behalf of the Pre-Closing Holders, including (i) any losses, claims, damages, liabilities, costs, expenses, judgments, fines or amounts paid in settlement incurred in connection with the acceptance or administration of the Holder Representative's duties, (ii) the fees and disbursements of outside counsel to the Holder Representative, (iii) the fees and expenses of any other agents, advisors, consultants and experts employed by the Holder Representative, and (iv) any such reserves as the Holder Representative determines in good faith to be appropriate for any fees and expenses that are not then known or determinable.

"Holder Indemnified Parties" means the Pre-Closing Holders and their respective heirs, executors, successors and assigns.

"HSR Act" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Indebtedness" means, with respect to any Person, at any particular time, all of the following liabilities or obligations, contingent or otherwise, of such Person: (a) all liabilities or obligations for borrowed money; (b) all liabilities or obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other liabilities or obligations in respect of letters of credit, bankers acceptances or other financial products; (c) all liabilities or obligations in respect of lease obligations that are required to be classified as capitalized lease obligations in accordance with GAAP; (d) all liabilities or obligations of others secured by an Encumbrance on any asset of a Person or its Subsidiaries, irrespective of whether such obligation or liability is assumed; (e) all liabilities or obligations to pay the deferred purchase price of assets or services with respect to which such Person or any Subsidiary of such Person is liable, as obligor or otherwise (including past acquisitions); (f) all liabilities or obligations under conditional sale or other title retention agreements; (g) all liabilities or obligations guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or with recourse) any obligation

4

of any other Person that constitutes Indebtedness under any of clauses (a) though (f) above or secured by any Encumbrance on the assets of such Person or any Subsidiary; and (h) any accrued interest, fees, expenses or penalties in respect of any of the foregoing, including repayment penalties, termination fees, reimbursements, indemnities, letters of credit and bankers' acceptances and consent fees, "breakage" costs, "break fees" or similar payments or contractual charges.  For the avoidance of doubt, all interest, prepayment penalties, premiums, fees and expenses (if any) which would be payable if all Company Indebtedness were paid in full on the Closing Date shall be treated as Indebtedness. Prior to Closing the Company may use Available Cash to pay all or a portion of the Indebtedness.

"Indemnified Party" means the Persons entitled to indemnification pursuant to Section 8.1 or 8.2, as the case may be.  Solely for purposes of providing notice in connection with a claim for indemnification by a Holder Indemnified Party, asserting such claim on behalf of the Holder Indemnified Parties and controlling the defense and settlement of such claim pursuant to Section 8.3, the term "Indemnified Party" refers to the Holder Representative, acting on behalf of the Holder Indemnified Parties.

"Indemnifying Party" means the Person or Persons having the obligation to indemnify another Person pursuant to Section 8.1.  Solely for the purpose of receiving notice in connection with a claim for indemnification by a Purchaser Indemnified Party, disputing and resolving such claim and controlling the defense and settlement of such claim pursuant to Section 8.3, the term "Indemnifying Party" refers to the Holder Representative; provided, however, that in no event will the Holder Representative have any obligation to indemnify any Person hereunder solely in its capacity as the Holder Representative.

"Intellectual Property" means any or all of the following: (a) all patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (b) all inventions (whether patentable or not), invention disclosures, improvements, proprietary information, know-how, technology, technical data and customer lists, and all documentation relating to any of the foregoing; (c) all copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto; (d) all industrial designs and any registrations and applications therefor; (e) all internet uniform resource locators, domain names, trade names, logos, slogans, designs, common law trademarks and service marks, trademark and service mark registrations and applications therefor; (f) all Software, databases and data collections and all rights therein; (g) all moral and economic rights of authors and inventors, however denominated; and (h) all rights arising out of or associated with the foregoing.

"Knowledge" means (a) in the case of an individual, the actual knowledge of such individual, upon reasonable inquiry, (b) in the case of the Company, the actual knowledge of Robert Nessler, Arjun Vasan and Christopher Lam, upon reasonable inquiry, and (c) in the case of Purchaser, the actual knowledge of Vishal Agarwal and Michael Bell, upon reasonable inquiry.

"Law" means any federal, state, local, municipal, foreign or international, multinational other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"Leased Real Property" means the parcels of real property of which the Company is the lessee or sublessee (together with all fixtures and improvements thereon).

"Legal Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Body or any arbitrator or arbitration panel.

"Losses" means any and all claims, liabilities, obligations, damages, losses, penalties, fines, judgments, costs and expenses (including amounts paid in settlement, costs of investigation and reasonable attorney's fees and expenses), whenever arising or incurred, and whether arising out of a third party claim.

"Made Available" shall mean that the Company has posted such materials to the virtual data room made available to Purchaser and its representatives before or during the negotiation of this Agreement.

"Material Adverse Effect" means any change, effect, event, occurrence, condition, circumstance, matter, state of facts or development that has, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the assets, business, properties, results of operations or condition (financial or otherwise) of the Company and its subsidiaries taken as a whole.

"Merger Consideration" means 321,199 Purchaser Common Shares.

"Net Working Capital" means the amount (which may be a positive or negative number), equal to (a) the aggregate amount of the consolidated assets of the Company that are treated as current assets as calculated in accordance with the Interim Financial Statements, minus (b) the aggregate amount of the consolidated liabilities of the Company that are treated as current liabilities as calculated in accordance with the Interim Financial Statements.

"Order" means any decree, injunction, writ, order, judgment or similar action.

"Participating Holder" means a Pre-Closing Holder who holds Common Stock.

"Participating Shares" means shares of Common Stock.

"Permitted Encumbrance" means any (a) Encumbrance for Taxes not yet due and payable (excluding Encumbrances arising under ERISA or the Code), (b) Encumbrances of carriers, warehousemen, mechanics, materialmen and repairmen incurred in the ordinary course of business consistent with past practice and not yet delinquent and (c) in the case of the Real Property, zoning, building, or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title, none of which, individually or in the aggregate, (i) interfere in any material respect with the present use of or occupancy of the affected parcel by the Company, (ii) have more than an immaterial effect on the value thereof or its use, or (iii) would impair the ability of such parcel to be sold for its present use.

"Per Share Amount" means that amount per share of Common Stock set out in the Closing Spreadsheet.

"Per Share Merger Consideration" means (x) the Merger Consideration divided by (y) the number of shares of Participating Shares issued and outstanding immediately prior to Closing.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, trust, Governmental Body or other organization.

"Pre-Closing Holder" means each Person who holds one or more share of Common Stock immediately prior to the Effective Time, as identified in the Closing Spreadsheet.

"Pro Rata Share" means, with respect to any Participating Holder, the percentage obtained, by dividing the amount of the Merger Consideration payable to such Participating Holder pursuant to this Agreement by the aggregate Merger Consideration payable to all Participating Holders pursuant to this Agreement. For avoidance of doubt, all Pro Rata Shares shall sum to 100%.

"Purchaser Common Shares" means the Common Stock of Purchaser, as defined in Purchaser's Amended and Restated Certificate of Incorporation, as amended.

"Purchaser Indemnified Parties" means Purchaser and its Affiliates (including, following the Effective Time, the Company), their respective Representatives and the heirs, executors, successors and assigns of any of the foregoing.

"Purchaser Related Agreement" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by Purchaser or Merger Sub in connection with the transactions contemplated hereby.

"Purchaser Voting Agreement" means that certain Voting Agreement of Purchaser, dated as of September 26, 2018, by and among the members party thereto, as amended.

"Purchaser Share Price" shall mean $0.41, subject to adjustment for stock splits and similar events.

"Real Property" means the Leased Real Property.

"Registered Intellectual Property" means all (a) patents and patent applications (including provisional applications), (b) registered trademarks and service marks, applications to register trademarks and service marks, intent-to-use applications, or other registrations or applications related to trademarks and service marks, (c) registered copyrights and applications for copyright registration, (d) domain name registrations and (e) any other Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued, filed with, or recorded with or by any Governmental Body.

"Representatives" means, with respect to a Person, the officers, directors, employees, agents, attorneys, accountants, advisors and representatives of such Person.

"Company Stockholder Approval" means the affirmative votes of the holders of a majority of the outstanding Common Stock, voting together as a single class.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Series A Preferred Stock" means the Series A Preferred Stock, $0.0005 par value, of Purchaser.

"Series A-1 Preferred Stock" means the Series A-1 Preferred Stock, $0.0005 par value, of Purchaser.

"Software" means any computer software program, together with any error corrections, updates, modifications, or enhancements thereto, in both machine-readable form and human readable form, including all comments and any procedural code.

"Subsidiary" means, with respect to any Person, any Entity in which such Person (a) owns, directly or indirectly, at least a majority of the outstanding voting securities, equity interests, profits interest or capital interest, (b) is entitled to elect at least one-half of the board of directors or similar governing body or (c) in the case of a limited partnership or limited liability company, is a general partner or managing member and has the power to direct the policies, management and affairs of such Entity.

"Tax" means any (a) tax (including income, franchise, business, corporate, capital, excise, gross receipts, ad valorem, property, sales, use, turnover, value added, stamp and transfer taxes), deduction, withholding, levy, charge, assessment, tariff, duty, impost, deficiency or other fee of any kind imposed by any Governmental Body; (b) all interest, penalties, fines, additions to tax or additional amounts imposed by any Governmental Body in connection with any item described in clause (a) or for failure to file any Tax Return; (c) any successor or transferee liability in respect of any items described in clauses (a) and (b) under Treasury Regulation 1502-6 (or any similar provision of state, local or foreign law); and (d) any amounts payable under any tax sharing agreement or other contractual arrangement (excluding amounts payable under any such agreement or arrangement not related to Taxes).

"Tax Return" means any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Law relating to any Tax.

"Transaction Documents" means, with respect to a party, all agreements, certificates and other instruments to be delivered by such party in connection with this Agreement.

"Treasury Regulations" means the temporary and final income Tax regulations promulgated under the Code.

"WARN" means the United States Worker Adjustment and Retraining Notification Act and similar state Laws.

Section 1.2    Other Defined Terms.  Each other capitalized term shall have the definition ascribed to it in this Agreement.

Section 1.3    Construction.

(a)    Unless the context of this Agreement otherwise requires, (i) words of any gender include the other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereunder," "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto; (iv) the terms "Article," "Section," "paragraph," "clause" and "Exhibit" refer to the specified Article, Section, paragraph, clause or Exhibit of this Agreement; and (v) the word "including" means "including, without limitation".

(b)    References to agreements and other documents (including this Agreement) to include (i) all subsequent amendments and other modifications thereto and (ii) all addenda, exhibits and schedules thereto.

(c)    References to statutes include all regulations promulgated thereunder and references to statutes or regulations will be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(d)    Whenever this Agreement refers to a number of days, such number refers to calendar days unless Business Days are specified.

(e)    All accounting terms used herein and not expressly defined herein have the meanings given to them under GAAP.

(f)        References to "$" or "dollars" will mean United States dollars.

(g)        A reference to any Person includes such Person's successors and permitted assigns.

(h)        When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded, and if the last day of such period is not a Business Day, the period will end on the next succeeding Business Day.

(i)        This Agreement was negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party will not apply to any construction or interpretation hereof.

(j)        The headings contained in this Agreement are for the convenience of reference only, will not be deemed to be a part of this Agreement and will not be referred to in connection with the construction or interpretation of this Agreement.

SECTION 2
THE MERGER

Section 2.1        Merger of Merger Sub into the Company.  Upon the terms and subject to the conditions set forth in this Agreement, at the Effective Time, Merger Sub will be merged with and into the Company, the separate existence of Merger Sub shall cease and the Company will continue as the surviving corporation of the Merger (the "Surviving Corporation").

Section 2.2        Effect of the Merger.  The Merger will have the effects set forth in this Agreement and in the applicable provisions of the DGCL.  Without limiting the foregoing and subject thereto, at the Effective Time, all of the property, rights, privileges, powers and franchises of each of the Company and Merger Sub will vest in the Surviving Corporation, and all debts, liabilities and duties of each of the Company and Merger Sub will attach to, and become the debts, liabilities and duties of, the Surviving Corporation.

Section 2.3        Closing; Effective Time.

(a)        Unless otherwise mutually agreed in writing between Purchaser and the Company, the consummation of the transactions contemplated by this Agreement (the "Closing") will take place virtually, at 10:00 A.M. (Eastern Time) on the date to be agreed by Purchaser and the Company.  The date on which the Closing actually takes place is referred to in this Agreement as the "Closing Date."  Contemporaneously with or as promptly as practicable after the Closing, a certificate of merger conforming to the requirements of the DGCL and substantially in the form of Exhibit A (the "Certificate of Merger") will be duly executed by the Company and filed with the Secretary of State of the State of Delaware.  The Merger will become effective upon the date and time of the filing of the Certificate of Merger with the Secretary of State of the State of Delaware or such other date and time as Purchaser and the Company may mutually agree and specify in the Certificate of Merger (such time being hereinafter referred to as the "Effective Time").

(b)        At or prior to the Closing (or, in those cases where a specified period of time before the Closing is indicated in this Agreement, by no later than such time), the Company will deliver, or cause to be delivered, to Purchaser the following:

9

(i)        a certificate in accordance with the requirements of Treasury Regulation Section 1.1445-2(c)(3), validly executed on behalf of the Company by a duly authorized officer thereof, that it is not a United States real property holding corporation;

(ii)       a resignation letter in the form of <u>Exhibit B</u>, effective as of the Effective Time, executed by each officer and director of, or Person performing similar functions for, any Group Company; and

(iii)      a letter of transmittal from each holder of Common Stock, in the form of <u>Exhibit C</u> (the "<u>Letter of Transmittal</u>");

(iv)      a Joinder Agreement to Purchaser Voting Agreement, in the form attached hereto as <u>Exhibit D</u> (the "<u>Joinder Agreement to Purchaser Voting Agreement</u>"), duly executed by each Participating Holder;[1]

(v)       an Investor Representation Letter, in the form attached hereto as <u>Exhibit E</u>, duly executed by each Participating Holder;

(vi)      Restrictive Covenant Agreements in the form of <u>Exhibit F</u> hereto executed by the individuals identified on <u>Schedule 2.3(b)(vi)</u>;

(vii)     Employment Offer Letters in the form of <u>Exhibit G</u> hereto executed by the individuals identified on <u>Schedule 2.3(b)(viii)</u>;

(viii)    Consulting Agreements in the form of <u>Exhibit H</u> hereto executed by the individuals identified on <u>Schedule 2.3(b)(viii)</u>;

(ix)      Retention Bonus Agreements in the form of <u>Exhibit I</u> executed by the individuals identified on <u>Schedule 2.3(b)(ix)</u> (the "<u>Bonus Agreements</u>");

(x)       The Company Stockholder Approval;

(xi)      A certificate of a duly authorized officer of the Company, attaching (i) a certified copy of resolutions of the board of directors of the Company authorizing the execution, delivery and performance of this Agreement, (ii) a certified copy of the Stockholder Approval, (iii) true and complete copies of the Organizational Documents of the Company and its Subsidiaries, and (iv) a certificate, dated no earlier than five business days prior to the Closing Date, of the Delaware Secretary of State as to the legal existence and good standing of the Company;

(xii)     a spreadsheet, reasonably agreed upon by Purchaser, indicating the number of Closing Shares to be issued to each holder of Participating Shares (the "<u>Closing Spreadsheet</u>").

(c)       At Closing, the Purchaser shall update its records to reflect the issuance of the Closing Shares to the holders of Participating Shares.

Section 2.4       <u>Certificate of Incorporation and Bylaws.</u>

---

[1] We have deleted the Merger Agreement Joinder Agreement based on our understanding that all stockholders will sign the Merger Agreement.  If that is not the case, then we will need to add the Joinder Agreement back in.

(a)    At the Effective Time, the certificate of incorporation of the Company will be amended as a result of the Merger so as to read in its entirety as set forth in Exhibit J, and, as so amended, will be the certificate of incorporation of the Surviving Corporation from and after the Effective Time, until thereafter changed or amended as provided therein and in accordance with the DGCL.

(b)    At the Effective Time, the bylaws of the Company will be amended so as to read in their entirety as set forth in Exhibit K, and, as so amended, will be the bylaws of the Surviving Corporation from and after the Effective Time, until thereafter changed or amended as provided therein and in accordance with the DGCL.

Section 2.5    Directors and Officers.

(a)    Unless otherwise determined by Purchaser prior to the Effective Time, the directors of Merger Sub immediately prior to the Effective Time will be the initial directors of the Surviving Corporation immediately after the Effective Time, each to hold office in accordance with the provisions of the DGCL and the certificate of incorporation and bylaws of the Surviving Corporation until their successors are duly elected and qualified.

(b)    Unless otherwise determined by Purchaser prior to the Effective Time, the officers of Merger Sub immediately prior to the Effective Time will be the initial officers of the Surviving Corporation immediately after the Effective Time, each to hold office in accordance with the provisions of the DGCL and the bylaws of the Surviving Corporation until their successors are duly elected and qualified.

SECTION 3
EFFECT OF THE MERGER ON COMPANY STOCK; CONVERSION OF SHARES

Section 3.1    Conversion of Shares.  Subject to Section 3.3, at the Effective Time, by virtue of the Merger and without any further action on the part of Purchaser, Merger Sub, the Company or any stockholder of the Company:

(a)    Converted Company Stock.  Each issued and outstanding share of Common Stock shall be cancelled and extinguished and shall be converted automatically into the right to receive the Per Share Merger Consideration therefor.

(b)    Merger Sub.  Each share of the common stock of Merger Sub outstanding immediately prior to the Effective Time will be converted into one fully paid and nonassessable share of common stock of the Surviving Corporation, and each stock certificate evidencing ownership of shares of common stock of Merger Sub will thereafter evidence ownership of shares of common stock of the Surviving Corporation.

Section 3.2    Dissenters' Rights.  Notwithstanding the foregoing provisions of this Section 3, the Dissenting Shares shall not be cancelled and extinguished and the holders thereof will be entitled to, and the Dissenting Shares will only represent the right to receive, payment of the fair value of such shares in accordance with Section 262 of the DGCL; provided, however, that (i) if any such holder of Dissenting Shares fails to establish such holder's entitlement to appraisal rights as provided in Section 262 of the DGCL, (ii) if any such holder of Dissenting Shares effectively withdraws such holder's demand for appraisal of such shares or loses its right to appraisal and payment for such holder's shares under Section 262 of the DGCL, or (iii) if a court of competent jurisdiction determines that such holder is not entitled to receive payment for such holder's Dissenting Shares or such holder otherwise loses such holder's appraisal rights, such holder will forfeit the right to appraisal of such Dissenting Shares and each such Dissenting Share shall no longer constitute a Dissenting Share, and will thereupon be treated as if they had been cancelled and extinguished with no consideration as of the Effective Time pursuant to Section 3.1(a).  The

11

Company will give Purchaser and Merger Sub prompt notice of any written demands received by the Company for appraisal of such shares, and Purchaser and Merger Sub will have the right to participate in all negotiations and proceedings with respect to such demands except as required by applicable Law.  The Company will not, except with the prior written consent of Purchaser, voluntarily make any payment with respect to any demands for fair value for Dissenting Shares or offer to settle or negotiate in respect of any such demands.

Section 3.3    Withholding Rights.   Each of Purchaser, Merger Sub and the Surviving Corporation will be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it reasonably determines in good faith it is required to deduct and withhold with respect to the making of such payment under the Code, or any other applicable Law.  To the extent that amounts are so withheld and duly remitted with the appropriate Governmental Body by Purchaser, Merger Sub or the Surviving Corporation, as the case may be, such withheld amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

SECTION 4
REPRESENTATIONS AND WARRANTIES OF THE STOCKHOLDERS

As an inducement to Purchaser and Merger Sub to enter into this Agreement and to consummate the Transactions contemplated hereby, each Stockholder hereby represents and warrants to Purchaser and Merger Sub as of the date hereof and as of the Closing as follows (except as set forth in the corresponding section of the Disclosure Schedule):

4.1    Organization and Capacity.

(a)    For a Stockholder which is an entity other than a trust, such Stockholder (i) is an entity duly organized, validly existing and in good standing under the Laws of the state of its formation and (ii) has all necessary corporate power and corporate authority to carry on its business, and to own or use the properties and assets that it purports to own or use.

(b)    For a Stockholder which holds shares as a trustee of a trust, such trust (i) is in full force and effect, (ii) has not taken, and no other Person has taken, any action to effect a termination, liquidation, or bankruptcy of such trust and (iii) has only the trustee listed on the signature page hereto, which trustee has been duly appointed.

(c)    For a Stockholder which is an individual, such Stockholder (i) is mentally competent and in all respects of sound mind, (ii) has not been deprived of his or her civil rights, (iii) is over the age of twenty-one (21), (iv) is used to managing his or her financial affairs, (v) has not had a conservator or guardian appointed for him or her pursuant to a court order, and (vi) is familiar with and fully understands the nature, purpose and effect of this Agreement and each Transaction Document and the Transactions.

4.2    Authority and Enforceability.  Such Stockholder has all requisite power and authority or capacity (as applicable), and has taken all action necessary, to execute and deliver this Agreement and each Transaction Document and to perform its obligations hereunder and thereunder.  This Agreement and each Transaction Document has been duly authorized, executed and delivered by such Stockholder, and this Agreement and each Transaction Document constitutes the legal, valid and binding obligations of such Stockholder, enforceable against such Stockholder in accordance with their terms.

4.3    Title to Shares.  Such Stockholder is the record and beneficial owner of, and has good and valid title to, the Shares set forth in the Disclosure Schedule, free and clear of all Encumbrances.  Such

Stockholder is not a party to any option, warrant, right, contract, call, put or other agreement or commitment providing for the disposition or acquisition of any of the Shares (other than this Agreement and the Rollover Agreement). Such Stockholder does not have any other debt or ownership interest in any Group Company.

(b)    Other than this Agreement, the Shares owned by such Stockholder are not subject to any voting trust agreement or other Contract restricting or otherwise relating to the voting, dividend rights or other disposition.

(c)    Neither the ownership by such Stockholder of Shares, nor the right of such Stockholder to transfer Shares free and clear of Encumbrances are subject to any community property interests or laws of any jurisdiction which could require signature of any other party or parties in order to be effective.

4.4    No Conflict. The execution and delivery by such Stockholder of this Agreement and each Transaction Document, and the performance by it of any actions contemplated hereunder or thereunder, does not and will not, directly or indirectly (with or without notice or lapse of time):

(a)    conflict with or violate any provision of the Governing Documents of such Stockholder;

(b)    require notice, consent or approval under, conflict with, violate, result in a breach of, result in the acceleration of obligations, loss of a benefit or increase in Liabilities or fees under, create in any Person the right to terminate, cancel or modify, or cause a default under or give rise to any rights or penalties under (i) any provision of Law relating to such Stockholder, (ii) any provision of any Governmental Order to which such Stockholder or any of his properties are subject, (iii) any provision of any Contract to which such Stockholder or its properties are bound, or (iv) any other restriction of any kind or character to which such Stockholder or its properties are subject; or

(c)    require a registration, filing, application, notice, consent, approval, order, qualification or waiver with, to or from any Governmental Authority.

4.5    Legal Proceedings. There are no Actions pending or, to such Stockholder's knowledge, threatened against or by such Stockholder or any Affiliate of such Stockholder that challenge or seek to prevent, enjoin or otherwise delay the Transactions.

4.6    Acknowledgement. The Stockholder acknowledges that it, he or she has conducted its, his or her own independent review and analysis of the business, assets, condition, operations and prospects of Purchaser and the Merger Sub. In entering into this Agreement and in deciding whether to vote in favor of the Merger and the other matters set forth in the Company Stockholder Approval executed and delivered by the Stockholder in connection with the Merger, The Stockholder has relied solely upon its, his or her own investigation and analysis and the representations and warranties of Purchaser and the Merger Sub set forth in Section 6 of this Agreement, and the Stockholder acknowledges and agrees that, except for the representations and warranties of Purchaser and the Merger Sub expressly set forth in Section 6 of this Agreement, including without limitation Section 6.7, neither Purchaser nor the Merger Sub, nor any of their respective Representatives nor any other Person acting on Purchaser's or the Merger Sub's behalf makes or has made, and the Stockholder is not relying on and has not relied on, any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to the Stockholder or any of its, his or her Representatives, or otherwise with respect to Purchaser, the Merger Sub, or any of their respective businesses or the Merger. Notwithstanding the foregoing, the acknowledgement set forth in this Section 4.6 shall not be deemed to limit any liability of Purchaser or its Affiliates with respect to Fraud.

13

4.7     Tax Matters.  The Stockholder has had an opportunity to review with its, his or her own tax advisors the tax consequences of the Merger and the transactions contemplated by this Agreement.  The Stockholder understands that it, he or she must rely solely on its, his or her tax advisors and not on any statements or representations regarding tax matters made by Purchaser, Merger Sub, the Company or any of their respective Representatives.  The Stockholder understands that the Stockholder (and not Purchaser, Merger Sub or the Company) shall be responsible for any Tax liability for the Stockholder that may arise as a result of any of the Merger or any of the other transactions contemplated by this Agreement.

4.8     Review.  The Stockholder has had an opportunity to carefully read this Agreement, and the Stockholder has had reasonable time and opportunity to discuss the requirements of such agreements with the Stockholder's financial, legal and other advisors, to the extent the Stockholder has determined necessary, prior to executing this Agreement.  The Stockholder acknowledges that it, he or she is relying solely on its, his or her own counsel and not on any statements or representations of Purchaser, Merger Sub or the Company or their respective Representatives for legal advice with respect to this Agreement and the transactions contemplated hereby and thereby.

4.9     Full Disclosure.  No representation or warranty by such Stockholder in this Agreement and no statement concerning such Stockholder contained in the Disclosure Schedule or any certificate furnished or to be furnished by such Stockholder to Purchaser and Merger Sub in connection with the Transactions contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

SECTION 5
REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to Purchaser and Merger Sub, as of the date hereof that:

Section 5.1     Organization; Standing and Power; Subsidiaries.

(a)     The Company is an Entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted.  The Company is duly qualified to do business and is in good standing as a foreign corporation or other Entity in each jurisdiction listed in Section 5.1(a) of the Company Disclosure Schedule, which jurisdictions constitute the only jurisdictions in which the character of the properties it owns, operates or leases or the nature of its activities makes such qualification necessary or advisable (except any jurisdiction in which the failure to obtain such qualification would not reasonably be expected to have a Material Adverse Effect).

(b)     Section 5.1(b) of the Company Disclosure Schedule sets forth the names of the members of the board of directors of the Company (the "Company Board") and the names and titles of the officers of the Company.

(c)     The Company has delivered to Purchaser true, correct and complete copies of the certificate of incorporation and bylaws (or similar organizational documents) of the Company, including all amendments thereto and as presently in effect (the "Organizational Documents").

Section 5.2     Authority; Enforceability; Company Action.

(a)     The Company has all requisite corporate power and authority to enter into and to perform its obligations under this Agreement and any Company Related Agreement to which it is a party, subject

14

only to the receipt of the Company Stockholder Approval.  The execution, delivery and performance by the Company of this Agreement and any Company Related Agreement to which it is a party have been duly authorized by all necessary corporate action on the part of the Company and no further corporate or similar action is required on the part of the Company to authorize this Agreement and any Company Related Agreement to which it is a party or the performance of its obligations hereunder or thereunder (subject, in the case of consummating the Merger, to the receipt of the Company Stockholder Approval).  This Agreement has been, and each Company Related Agreement will be as of the Closing Date, duly and validly executed and delivered by the Company.  This Agreement constitutes, and upon the execution and delivery of each Company Related Agreement, each such Company Related Agreement will constitute, the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to (a) laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (b) rules of law governing specific performance, injunctive relief and other equitable remedies (the "Bankruptcy and Equity Exception").

(b)    The board of directors of the Company, at a meeting duly called and held or by written consent in lieu thereof, has unanimously (i) determined that this Agreement and the Merger are advisable and fair to and in the best interests of the Company and its stockholders, (ii) approved and adopted the Merger, this Agreement and the other transactions contemplated hereby in accordance with the provisions of the DGCL and the Company's certificate of incorporation and bylaws, (iii) directed that this Agreement and the Merger be submitted to the stockholders of the Company for their approval and adoption and (iv) recommended that the stockholders of the Company vote in favor of the approval and adoption of this Agreement and the Merger.

(c)    The Company Stockholder Approval is the only vote of the holders of any class or series of the Company's capital stock necessary to adopt this Agreement and approve the Merger.

Section 5.3    Absence of Restrictions and Conflicts; Required Consents.

(a)    Other than any filings as may be required under the DGCL in connection with the Merger, and except as set forth in Section 5.3(a) of the Company Disclosure Schedule, no notices, reports or other filings are required to be made by the Company with, nor are any consents, registrations, approvals, permits or authorizations which, required to be obtained by the Company from, any Governmental Body in connection with the execution, delivery and performance of this Agreement by the Company and the consummation of the Merger and the other transactions contemplated hereby, or in connection with the continuing operation of the business of the Company following the Effective Time.

(b)    Except as set forth in Section 5.3(b) of the Company Disclosure Schedule, neither the execution, delivery or performance by the Company of this Agreement or any of the Company Related Agreements, nor the consummation of the Merger or any of the other transactions contemplated by this Agreement or any the Company Related Agreements, will directly or indirectly (with or without the giving of notice or the lapse of time or both): (i) conflict with or result in a violation of any provision of the certificate of incorporation or bylaws of the Company; (ii) assuming that all filings, permits, authorizations, consents and approvals referred to in the preceding Section 5.3(a) are made and obtained, conflict with or result in a violation of any Law or any Order to which the Company, or any of their respective assets, or any of the assets owned, used or controlled by the Company, is subject; (iii) conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any Governmental Authorization that is held by the Company; (iv) contravene, conflict with or result in a violation or breach of, or result in a default under, any provision of any Material Contract to which the Company is a party, or give any Person the right to (x) declare a default or exercise any remedy under any such Material Contract or (y) modify, terminate, or accelerate any right, liability or obligation of the Company under any such Material Contract, or charge any

15

fee, penalty or similar payment to the Company under any such Material Contract; or (v) result in the imposition or creation of any Encumbrance upon or with respect to any asset owned or used by the Company.

Section 5.4    Capitalization.

(a)    The authorized capital stock of the Company consists of 10,000,000 shares of Common Stock. As of the date of this Agreement, 10,000,000 shares of Common Stock are issued and outstanding, and no shares of capital stock of the Company are held in the treasury of the Company. All of the issued and outstanding Common Stock are duly authorized, validly issued, fully paid and non-assessable and are not subject to any Encumbrances or preemptive rights created by statute, the certificate of incorporation or bylaws of the Company or any Contract to which the Company is a party or by which it is bound, other than rights of first refusal in favor of the Company. Section 5.4(a) of the Company Disclosure Schedule sets forth, as of the date hereof, the name of each holder of Common Stock and for each such holder, the number of shares held by such Person and the number of the applicable Certificate or Certificates representing such shares. All of the outstanding Common Stock have been issued and granted in compliance with (i) all applicable securities and other Laws, and (ii) all requirements set forth in the Company's certificate of incorporation and bylaws and Contracts to which the Company is a party or is otherwise bound.

(b)    There are no preemptive or similar rights granted by the Company on the part of any holders of any class of securities of the Company. The Company has no outstanding bonds, debentures, notes or other obligations which grant the holders of which the right to vote (or which are convertible into or exercisable for securities having the right to vote) with the stockholders or other equity holders of the Company on any matter. Except as listed in Section 5.4(b) of the Company Disclosure Schedule, there are not any options, warrants, rights, convertible or exchangeable securities, "phantom" stock rights, stock appreciation rights, restricted stock units, stock-based performance units, commitments, Contracts, arrangements or undertakings of any kind to which the Company is a party or by which any of them is bound (i) obligating the Company to issue, deliver or sell or cause to be issued, delivered or sold, additional securities of, or other equity interests in, or any security convertible or exercisable for or exchangeable into any security of, or other equity interest in, the Company, (ii) obligating the Company to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking or (iii) that give any Person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights accruing to holders of securities of, or other equity interests in, the Company (collectively, "Company Rights"). There are no outstanding contractual obligations of the Company to repurchase, redeem or otherwise acquire any securities of, or other equity interests in, the Company. There are no proxies, voting trusts or other agreements or understandings to which the Company is a party or is bound with respect to the voting of the securities of, or other equity interests in, the Company.

Section 5.5    Company Financial Statements; Undisclosed Liabilities.

(a)    The Company has Made Available all information required by GAAP to be included or reflected in a balance sheet of the Company or statements of income, stockholders' equity and cash flow of the Company (the "Financial Information"). The Financial Information (i) was prepared from and in accordance with the books and records of the Company and (ii) fairly presents, in all material respects, the financial position of the Company as of such dates and the results of operations, changes in stockholders' equity and cash flows of the Company as of the Closing.

(b)    The Company does not have any liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of any type, whether current or non-current, accrued, absolute, contingent, matured, unmatured, determined, determinable or otherwise (whether or not required to be

16

reflected in financial statements prepared in accordance with GAAP), whether known or unknown, except such liabilities or obligations that have arisen in the ordinary course of business, consistent with past practice, since February 1, 2024 and which are not in excess of $5,000 in aggregate.

(c)        The Company does not have any assets (current or non-current) other than (a) the cash set out in Section 5.5(d) and (b) any assets set out in Sections 5.8 or 5.9 of the Disclosure Schedule.

(d)        The Company's level of cash is at least the amount of the Closing Cash. Since January 1, 2024, the Company has conducted its cash management customs and practices in the usual and ordinary course of business consistent with past custom and practice in all material respects.

Section 5.6        Absence of Changes.  Since August 2, 2023, (a) the Company has conducted its businesses only in the ordinary course consistent with past practice; (b) there has not been any change, event or development or prospective change, event or development that, individually or in the aggregate, has had or is reasonably likely to have a Material Adverse Effect; (c)  the Company has not suffered any loss, damage, destruction or other casualty affecting, any of its material properties or assets, whether or not covered by insurance; and (d) the Company has not taken any action set forth below:

(a)        declared, set aside, made or paid any non-Cash dividend or other distribution on or with respect to any of its capital stock or other equity or ownership interest;

(b)        authorized, or made any commitment with respect to, any single capital expenditure that is in excess of $10,000 or capital expenditures that are, in the aggregate, in excess of $50,000 for the Company or its Subsidiaries;

(c)        increased the compensation payable or to become payable or the benefits provided to its directors, managers, officers, employees, consultants or advisors except for normal merit and cost-of-living increases consistent with past practice in salaries or wages of employees of the Company, or granted any severance or termination payment to, or paid, loaned or advanced any amount to, any director, manager, officer employee, consultant or advisor of the Company, or established, adopted, entered into or amended any Plan, or made any declaration, payment or commitment or obligation of any kind for the payment (whether in cash, equity or otherwise) of a severance payment, termination payment, bonus or other additional salary or compensation to any such Person, except payments made pursuant to written agreements outstanding on the date hereof and disclosed in the Disclosure Schedules;

(d)        made any change in any method of accounting or accounting practice or policy, except as required by GAAP;

(e)        made, revoked or modified any Tax election, settled or compromised any Tax liability or filed any Tax Return other than on a basis consistent with past practice;

(f)        paid, discharged or satisfied any claim, liability or obligation (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction, in the ordinary course of business consistent with past practice, of liabilities reflected or reserved against on the Unaudited Interim Balance Sheet or subsequently incurred in the ordinary course of business consistent with past practice;

(g)        cancelled, compromised, waived or released any right or claim other than in the ordinary course of business consistent with past practice;

(h)     accelerated the collection of or discounted any accounts receivable, delayed the payment of accounts payable or deferred expenses, reduced inventories or otherwise increased cash on hand, except in the ordinary course of business consistent with past practice;

(i)     commenced or settled any Action; or

(j)     announced an intention, entered into any formal or informal agreement, or otherwise made a commitment to do any of the foregoing.

Section 5.7     Title to and Sufficiency of Assets.

(a)     The Company has good, valid, transferable and marketable title to, or valid leasehold interests in or license rights to, all of its properties and assets, in each case free and clear of all Encumbrances, except for Permitted Encumbrances.

(b)     The properties and assets owned by the Company or used by them under enforceable Contracts constitute all of the properties and assets (whether real, personal or mixed and whether tangible or intangible) necessary and sufficient to permit the Company to conduct its business after the Effective Time in accordance with its past practice and as presently conducted.

Section 5.8     Real Property; Personal Property.

(a)     The Company does not occupy or use, or have any rights or obligations with respect to, any Leased Real Property.

(b)     All material items of tangible personal property and assets of the Company (i) are free of defects and in good operating condition and in a state of good maintenance and repair, subject to ordinary wear and tear and (ii) were acquired and are usable in the regular and ordinary course of business.

Section 5.9     Intellectual Property.

(a)     Section 5.9(a) of the Company Disclosure Schedule contains a true, correct and complete list of all Company Registered Intellectual Property (reflecting, in each case, ownership where there is co-ownership with a Person other than the Company, filing date, date of issuance and registration or application numbers, as applicable).

(b)     With respect to the applications and registrations for Company Registered Intellectual Property set forth in Section 5.9(a) of the Company Disclosure Schedule, (i) the Company is the record owner of such applications and registrations, (ii) such applications and registrations have been duly maintained, are subsisting, valid, in full force and effect, and have not been cancelled, expired, or abandoned, (iii) there are no facts or circumstances that would render such applications and registrations invalid or unenforceable, (iv) there are no pending or, to the Knowledge of the Company, threatened interferences, re-examinations, oppositions or cancellation proceedings involving such applications and registrations and (v) such applications have been prosecuted in accordance with all applicable rules, practices and procedures of the U.S. Patent and Trademark Office or other applicable Governmental Body.

(c)     The Company owns, free and clear of any Encumbrances (other than Permitted Encumbrances), or has a valid and enforceable right to use, all Intellectual Property used or proposed to be used in connection with the operation and conduct of their businesses.

(d)      Section 5.9(d) of the Company Disclosure Schedule sets forth a true, correct and complete list of the Company Proprietary Software (other than documentation) currently offered or planned to be offered on a commercial basis.

(e)      The Company has entered into work made for hire agreements or obtained assignments from their respective employees, former employees, independent contractors and former independent contractors who contributed to the creation or development of any Company Intellectual Property which the Company purports to own, assigning to the Company all Intellectual Property created or developed in connection with such employment or engagement.

(f)      Neither the Company nor any of its current or proposed products or services have infringed upon, misappropriated or violated or are currently infringing upon, misappropriating or otherwise violating any Intellectual Property rights of any Person; and no third party is infringing upon, misappropriating or otherwise violating any Intellectual Property of the Company.  The Company has not received from any Person any written notice or claim that the Company is infringing upon, misappropriating or otherwise violating any Intellectual Property rights of any Person.  No proceedings are pending or, to the Knowledge of the Company, threatened, that challenge the validity, ownership or use of any Company Intellectual Property that is owned by the Company.

(g)      The Company has not licensed any Company Intellectual Property to any Person on an exclusive basis.

(h)      Except as stated in Section 5.9(h) of the Company Disclosure Schedule, no source code for any Company Proprietary Software has been delivered, licensed, or made available to any escrow agent or other Person who is not an employee of the Company.

(i)      The Company has taken commercially reasonable steps to protect their rights in the Confidential Information and to prevent the unauthorized disclosure or use of the Confidential Information.

(j)      The Company has not incorporated any open source Software in any Software owned by the Company or in any Software that was developed, licensed, distributed, used or otherwise exploited by or for the Company, in a manner that requires the contribution, licensing or disclosure to any third party by the Company, including the open source Software community, of any portion of the source code of any such Software owned by the Company or developed, licensed, distributed, used or otherwise exploited by or for the Company.

Section 5.10      Contracts.

(a)      Except as set forth in Section 5.10(a) of the Company Disclosure Schedule, the Company is not a party to or bound by:

(i)      any Contract relating to the employment of, or the performance of services by, any employee, consultant or independent contractor (A) that is not terminable at will by the Company on thirty (30) days or less notice without further liability, (B) providing severance payments or other benefits or (C) providing for the payment of any cash or other compensation in connection with the consummation of the transactions contemplated hereby (whether upon or at any time following the Closing);

(ii)      any Contract that limits, or purports to limit, the ability of any of the Company, or any officers, directors, employees, stockholders or other equity holders, agents or representatives

of any of the Company (in their capacities as such) to compete in any line of business or with any Person or in any geographic area or during any period of time;

(iii)    any Contract, including any stock option plan, stock appreciation rights plan, stock purchase plan or phantom stock plan, any of the benefits of which will be increased, or the vesting of benefits of which will be accelerated or may be accelerated, by the occurrence of any of the transactions contemplated by the Agreement or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated by this Agreement;

(iv)    any bond, debenture, note, credit or loan agreement, security agreement, mortgage or other Contract relating to Indebtedness of the Company;

(v)    any Contract relating to the creation of any Encumbrance with respect to any asset of the Company;

(vi)    any Contract involving or incorporating any guaranty, pledge, performance or completion bond, indemnity or surety by the Company with respect to the performance of any other Person;

(vii)    any Contract creating or relating to any partnership or joint venture or any sharing of revenues, profits, losses, costs or liabilities;

(viii)    any Contract relating to the purchase or sale of any product or other asset by or to, or the performance of any services by or for, any Affiliate of the Company;

(ix)    any Contract relating to the disposition or acquisition of assets or any interest in any business enterprise outside the ordinary course of the Company's business;

(x)    any inbound or outbound license, royalty or other Contract with respect to any Company Intellectual Property (except for license agreements of non-customized, generally commercially available off the shelf software subject to "shrink wrap" or "click wrap" license agreements and except for Contracts with respect to products no longer offered by the Company);

(xi)    any Contract providing for the performance of services or delivery of goods or materials by or to the Company that involves individual payments by the Company in excess of $10,000 or total future payments by the Company in excess of $10,000;

(xii)    any outstanding power of attorney empowering any Person to act on behalf of the Company; or

(xiii)    any other Contract that involves individual payments by the Company in excess of $10,000 or total payments by the Company in excess of $10,000 per annum and is not cancellable by the Company on 30 days or less notice without liability or penalty.

(b)    The Company has delivered to Purchaser true, correct and complete copies of each Contract set forth, or required to be set forth, in Section 5.10(a) of the Company Disclosure Schedule (each, a "Material Contract").

(c)    Each Material Contract is valid and in full force and effect and is enforceable by the Company in accordance with its terms. The Company is not in breach, violation or default under, or has received written notice that it is in breach, violation or default under, any of the terms or conditions of any

20

Material Contract and, to the Knowledge of the Company, no other party thereto is in breach, violation or default under, any of the terms or conditions of any Material Contract.

Section 5.11    Compliance with Laws; Governmental Authorizations.

(a)    The Company is in and has been in material compliance with all applicable Laws.  The Company has not received any notice or other written communication from any Governmental Body regarding any actual or possible violation of, or failure to comply with, any Law.

(b)    Section 5.11(b) of the Company Disclosure Schedule identifies each Governmental Authorization held by the Company (indicating, in each case, the holder of such Governmental Authorization).  The Governmental Authorizations held by the Company are valid and in full force and effect, and constitute all Governmental Authorizations necessary to enable the Company to conduct its business in the manner in which its business is currently being conducted and as presently planned to be conducted.  The Company is in material compliance with the terms and requirements of the respective Governmental Authorizations held by such Entity. The Company has not received any written notice or other written communication from any Governmental Body regarding (i) any actual or possible violation of or failure to comply with any term or requirement of any Governmental Authorization, or (ii) any actual or possible revocation, withdrawal, suspension, cancellation, termination or modification of any Governmental Authorization.

Section 5.12    Legal Proceedings; Orders.  There is no Legal Proceeding pending or, to the Knowledge of the Company, threatened against the Company or any of its or their respective properties or assets.  There is no Order to which the Company, or any of its or their respective properties or assets is subject.

Section 5.13    Tax Matters.

(a)    All material Tax Returns due to have been filed by the Company through the date hereof in accordance with all applicable Laws (pursuant to an extension of time or otherwise) have been duly filed and are true, correct and complete in all material respects.  No written claim has ever been made by a Governmental Body in a jurisdiction where the Company does not file Tax Returns that it is or may be subject to taxation or to a requirement to file Tax Returns in that jurisdiction.

(b)    Except as stated in Section 5.13(b) of the Company Disclosure Schedule, all Taxes, deposits and other payments for which the Company has liability (whether or not shown on any Tax Return) have been timely paid in full or are accrued as liabilities for Taxes on the books and records of the Company, as applicable.

(c)    There are not any extensions of time currently in effect with respect to the dates on which any Tax Returns were or are due to be filed by the Company.

(d)    All Tax deficiencies asserted as a result of any examination by a Governmental Body of a Tax Return of the Company have been paid in full, accrued on the books of the Company, as applicable, or finally settled.

(e)    No written claims have been asserted and no written proposals or deficiencies for any Taxes of the Company are being asserted, proposed or, to the Knowledge of the Company, threatened, and no audit or investigation of any Tax Return of the Company is currently underway, pending or threatened.

21

(f)      The Company has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor or stockholder thereof or other third party and have timely filed all Tax Returns or other reports with respect to such payments in accordance with the Code.

(g)      There are no outstanding waivers or agreements between any Governmental Body and the Company for the extension of time for the assessment of any Taxes or deficiency thereof, nor are there any requests for rulings, outstanding subpoenas or requests for information, notice of proposed reassessment of any property owned or leased by the Company or any other matter pending between the Company and any Governmental Body.

(h)      There are no Encumbrances for Taxes (excluding Permitted Encumbrances) with respect to the Company or the assets or properties thereof, nor is there any such Encumbrance that is pending or, to the Knowledge of the Company, threatened.

(i)      The Company is not a party to or bound by any Tax allocation or sharing agreement or similar Contract or arrangement that obligates or may obligate it to make any payment computed by reference to Taxes, taxable income or taxable losses of any other Person (except to the extent such agreement, contract or arrangement was entered into in the ordinary course of business and not primarily related to Taxes).

(j)      The Company has not constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock qualifying for tax free treatment under Section 355 of the Code (i) in the two years prior to the date of this Agreement or (ii) in a distribution which could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in connection with the Merger.

(k)      The Company has not been a member of an "affiliated group" of corporations (within the meaning of Code § 1504) filing a consolidated federal income tax return (other than a group the common parent of which is the Company).

(l)      The Company has no liability for the Taxes of any Person (other than for itself) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by contract or otherwise.

(m)      The Company has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

Section 5.14      Company Benefit Plans.

(a)      The Company does not maintain or have any Company Benefit Plan.

(b)      The transactions contemplated by this Agreement will not result (either alone or in combination with any other event) in (i) any payment of, or increase in, remuneration or benefits, to any employee, officer, director or consultant of the Company, (ii) any cancellation of indebtedness owed to the Company by any employee, officer, director or consultant of the Company, (iii) the acceleration of the vesting, funding or time of any payment or benefit to any employee, officer, director or consultant of the Company or (iv) any "parachute payment" within the meaning of Section 280G of the Code (whether or not such payment is considered to be reasonable compensation for services rendered).  The Company is not

a party to any Contract, nor do any of them have any liability (current or contingent), to compensate any individual for excise Taxes due under Section 4999 of the Code.

(c)    Any Company agreement that constitutes a "non-qualified deferred compensation plan" subject to Code Section 409A complies with Code Section 409A with respect to its form and operation, no amounts under any such Company Benefit Plan are or have been subject to the interest and additional Tax set forth under Code Section 409A(a)(1)(B), and there is no obligation to reimburse or otherwise "gross-up" any Person for the interest or additional Tax set forth under Code Section 409A(a)(1)(B).  To the extent applicable, all Company Rights granted by the Company were granted using an exercise price or a base price, as the case may be, of not less than the fair market value of the underlying shares as of the grant date, and are not otherwise subject to the requirements of Code Section 409A.

Section 5.15    Insurance.

(a)    Section 5.15(a) of the Disclosure Schedule sets forth the following information with respect to each insurance policy (including policies providing property, casualty, liability, director & officer, and workers' compensation coverage and bond and surety arrangements) with respect to which the Company is a party, a named insured, or otherwise the beneficiary of coverage (collectively, the "Company Insurance Agreements"): (a) the name of the insurer, the name of the policyholder, and the name of each covered insured; and (b) the policy number and the period of coverage.

(b)    There is no claim by the Company or any other Person pending under any such policies and bonds as to which coverage has been questioned, denied or disputed.  All premiums payable under all such policies and bonds have been paid.  There are no threatened terminations of, or material premium increases with respect to, any of such policies or bonds.  Section 5.15(b) of the Disclosure Schedule sets forth a list of all claims made under the Company Insurance Agreements, or under any other insurance policy, bond or agreement covering the Company or any of its Subsidiaries or their operations.  The Company has maintained insurance policies with coverage and policy limits that are substantially similar to the coverage and policy limits provided by the Company Insurance Agreements.

Section 5.16    Employee and Labor Matters.

(a)    Section 5.16(a) of the Company Disclosure Schedule contains a true, correct and complete list of the employees of the Company as of the date hereof and shows with respect to each such employee the employee's name, position held, principal place of employment, annual base salary or hourly wage rate, as applicable.

(b)    Section 5.16(b) of the Company Disclosure Schedule contains a true, correct and complete list of all independent contractors used by the Company as of the date hereof.

(c)    The Company is not, and has not been, a party to any collective bargaining agreement and no union or other labor organization has been certified or voluntarily recognized by any Governmental Body as an agent of collective bargaining for any employees of the Company.  No representation election petition or application for certification has been filed by employees of the Company and is pending with the National Labor Relations Board or any other Governmental Body and to the Knowledge of the Company, there have been no other union organization attempts or threatened attempts with respect to the Company.  There is no union, works council, employee representative or other labor organization which, pursuant to applicable Law, must be notified, consulted or with which negotiations must be conducted in connection with the transactions contemplated by this Agreement.  There has not arisen any strike, work stoppage or other material labor dispute involving the Company.

23

(d)     The Company has not been engaged in any unfair labor practice.  The Company has at all times has complied with all applicable Laws relating to employment, employment practices, labor and terms and conditions of employment, including employment discrimination and harassment, collective bargaining, wages and salaries, withholding, hours, worker classification, occupational health and safety, workers compensation, leaves of absence, immigration, WARN and any similar Laws.  There are no administrative charges or court complaints or, to the Knowledge of the Company, investigations against the Company concerning alleged employment discrimination, collective bargaining, wage and hour issues, worker classification or workplace safety, or any other employment related matters pending or, to the Knowledge of the Company, threatened before the U.S. Equal Employment Opportunity Commission or any other Governmental Body.

(e)     Except as stated in Section 5.16(e) of the Company Disclosure Schedule, the Company has maintained workers' compensation coverage as required by applicable Law through the purchase of insurance and not by self-insurance or otherwise.

(f)     None of the current or former independent contractors of the Company could be reclassified as an employee and no current or former employees classified as "exempt" from overtime requirements could be reclassified as non-exempt.

Section 5.17     Customers and Vendors.

(a)     Section 5.17(a) of the Company Disclosure Schedule sets forth a true, correct and complete list of (i) the 5 largest vendors to the Company, taken as a whole, for the period beginning on formation of the Company and ending February 28, 2024 (determined on the basis of the total dollar amount paid) (each, a "Material Vendor").  The Company does not have any customers.

(b)     Except as stated on Section 5.17(b) of the Company Disclosure Schedule, at no time has there been any termination, cancellation or material curtailment of the business relationship of the Company with any Material Vendor nor, to the Knowledge of the Company, has any Material Vendor indicated an intent to so terminate, cancel or materially curtail its business relationship with the Company, whether as a result of the consummation of the transactions contemplated hereby or otherwise.

Section 5.18     Brokers, Finders and Investment Bankers.  No broker, finder, investment banker or other Person is entitled to any brokerage, finder's or other fee or commission in connection with this Agreement or any of the other transactions contemplated hereby based upon arrangements made by or on behalf of the Company.

Section 5.19     Disclosure. Neither this Agreement nor any agreement, attachment, schedule, exhibit, certificate or other statement delivered pursuant to this Agreement or in connection with the transactions contemplated hereby omits to state a material fact necessary in order to make the statements and information contained herein or therein, not misleading.  The Company is not aware of any information necessary to enable a prospective purchaser of the Company Shares or the business of the Company and its Subsidiaries to make an informed decision with respect to the purchase of such Company Shares or business that has not been expressly disclosed herein.  Purchaser has been provided full and complete copies of all documents referred to on the Disclosure Schedule.

SECTION 6
REPRESENTATIONS AND WARRANTIES OF PURCHASER AND MERGER SUB

Purchaser and Merger Sub represent and warrant to the Company, as of the date hereof that:

Section 6.1    Organization; Standing and Power.  Each of Purchaser and Merger Sub is an entity duly formed, validly existing and in good standing under the Laws of its jurisdiction of organization, and has all corporate power required to conduct its business as now conducted.  Each of Purchaser and Merger Sub is duly qualified to do business and is in good standing in each jurisdiction in which the conduct of its business or the ownership or leasing of its properties requires such qualification, except where the failure to be so qualified would not reasonably be expected to prevent, materially delay or materially impair the ability of Purchaser or Merger Sub to consummate the transactions contemplated hereby.

Section 6.2    Authority; Enforceability; Company Action.  Each of Purchaser and Merger Sub has all requisite corporate power and authority to enter into and perform its obligations under this Agreement and under each Purchaser Related Agreement to which it is a party, subject only to the adoption of this Agreement by the sole stockholder of Merger Sub.  The execution, delivery and performance by each of Purchaser and Merger Sub of this Agreement and each Purchaser Related Agreement to which it is a party have been duly authorized by all necessary corporate action on the part of Purchaser and Merger Sub and no further corporate or similar action is required on the part of Purchaser or Merger Sub to authorize this Agreement and any Purchaser Related Agreement to which it is a party or the performance of its obligations hereunder or thereunder (subject, in the case of consummating the Merger, to the adoption of this Agreement by the sole stockholder of Merger Sub).  This Agreement has been, and each Purchaser Related Agreement to which it is a party will be as of the Closing Date, duly and validly executed and delivered by each of Purchaser and Merger Sub.  This Agreement constitutes, and upon the execution and delivery of each Purchaser Related Agreement to which it is a party, each such Purchaser Related Agreement will constitute, the legal, valid and binding obligation of each of Purchaser and Merger Sub, subject to the Bankruptcy and Equity Exception.

Section 6.3    Absence of Restrictions; Required Consents.

(a)    Other than any filings as may be required under the DGCL in connection with the Merger, no notices, reports or other filings are required to be made by Purchaser or Merger Sub with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by Purchaser or Merger Sub from, any Governmental Body in connection with the execution, delivery and performance of this Agreement by Purchaser or Merger Sub and the consummation of the Merger and the other transactions contemplated hereby.

(b)    Neither the execution, delivery or performance by Purchaser or Merger Sub of this Agreement or any of the Purchaser Related Agreements, nor the consummation of the transactions contemplated by this Agreement or any of the Purchaser Related Agreements, will directly or indirectly (with or without notice or lapse of time): (i) conflict with or result in a violation of any of the provisions of the organizational documents of Purchaser or Merger Sub; (ii) assuming that all filings, permits, authorizations, consents and approvals referred to in the preceding Section 5.3(a) are made and obtained, conflict with or result in a violation of any Law or Order to which Purchaser or Merger Sub, or any of the assets owned, used or controlled by Purchaser and Merger Sub, is subject; (iii) conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any Governmental Authorization that is held by Purchaser or Merger Sub; or (iv) contravene, conflict with or result in a violation or breach of, or result in a default under, any provision of any Contract to which Purchaser or Merger Sub is a party, or give any Person the right to (x) declare a default or exercise any remedy under any such Contract or (y) modify, terminate, or accelerate any right, liability or obligation of Purchaser or Merger Sub under any such Contract, or charge any fee, penalty or similar payment to Purchaser or Merger Sub under any such Contract.

Section 6.4    Finders' Fees.  Except as disclosed on Schedule 6.4, there is no investment banker, broker, finder, or other intermediary that has been retained by or is authorized to act on behalf of the

25

Purchaser or any Affiliate thereof, who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement or any Company Related Agreement other than fees (if any) that will be paid by the Purchaser or its Affiliates and for which the Pre-Closing Holders will have no responsibility to pay.

Section 6.5    Capitalization.  The authorized capital stock of Purchaser consists of 12,853,931 shares of Series A Preferred Stock, 1,928,909 shares of Series A-1 Preferred Stock and 30,589,995 Purchaser Common Shares.  Each share of Series A Preferred Stock and Series A-1 Preferred Stock is convertible into one (1) Purchaser Common Share.

Section 6.6    Investment Intent.  Purchaser is acquiring the shares for its own account for investment purposes only and not with a view to any public distribution or with any intention of selling, distributing or otherwise disposing of the shares in a manner that would violate the registration requirements of the Securities Act. Purchaser is a sophisticated investor. Purchaser is able to bear the economic risk of holding the shares for an indefinite period of time (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

Section 6.7    To Purchaser's Knowledge, none of the representations and warranties in this Section 6 contain any untrue statement of a material fact or omit to state a material fact required to be stated or necessary to make the representations and warranties in this Section 6, in light of the circumstances under which they were made, not false or misleading.

SECTION 7
CERTAIN COVENANTS AND AGREEMENTS

Section 7.1    Employee Matters.

(a)    As of the Closing, if and as requested by Purchaser, the Company will terminate, or cause to be terminated, certain or all of the Company Benefit Plans as requested by Purchaser and will ensure that no employee or former employee of the Company has any rights under such Company Benefit Plans and that any liabilities of the Company under such Company Benefit Plans (including any such liabilities relating to services performed prior to the Closing) are fully extinguished at no cost to the Company, the Surviving Corporation, Purchaser or its Affiliates.

(b)    The Company will not make any communication to employees of the Company regarding any Employee Benefit Plan maintained by Purchaser or any of its Affiliates or any compensation or benefits to be provided by Purchaser or any of its Affiliates (including the Surviving Corporation or any Subsidiary thereof) after the Closing Date without the advance approval of Purchaser.

Section 7.2    Public Announcements.  All press releases or other public communications of any nature whatsoever relating to the transactions contemplated by this Agreement, and the method of the release for publication thereof, will be subject to the prior mutual approval of (a) Purchaser and (b) prior to the Effective Time, the Company, and following the Effective Time, the Holder Representative, which approval will not be unreasonably withheld or delayed; provided, however, that such prior approval will not be required for any press release or other public communication by Purchaser, the Company or the Holder Representative (i) as required by applicable Law or the rules of any stock exchange or the SEC, in which case the other party will be advised and the parties will use commercially reasonable efforts to cause a mutually agreeable release, announcement or other disclosure to be issued; (ii) as required in order to fulfill its obligations under this Agreement; and (iii) disclosures which only repeat information that is

26

already publicly available (it being understood and agreed that, for purposes hereof, information contained in the Certificate of Merger shall not be considered publicly available solely as a result of the filing thereof).

Section 7.3    Tax Covenant and Post-Closing Tax Actions.

(a)    Tax Returns.  Following the Effective Time, Purchaser will cause the Company to prepare and timely file or cause to be prepared and timely filed, in a manner consistent in all material respects with the past practices of the Company (except where otherwise required by applicable Law), (i) all Tax Returns of the Company for Tax periods ending on or prior to the Closing Date ("Pre-Closing Tax Periods") which are due to be filed after the Closing Date (taking into account all applicable extensions of time for filing) and (ii) all Tax Returns of the Company for Tax periods which begin before the Closing Date and end after the Closing Date ("Straddle Tax Periods").  Purchaser will cause any such Tax Return to be delivered to the Holder Representative for review and comment no later than 30 days before the due date (after giving effect to any applicable extensions) of such Tax Return, unless Purchaser confirms in writing to the Holder Representative that it will not make any claim for indemnification pursuant to Section 8 with respect to such Tax Return.  Purchaser will cause the Company to incorporate any reasonable comments provided in writing by the Holder Representative to Purchaser with respect to all such Tax Returns which the Holder Representative is entitled to review and comment on pursuant to the immediately preceding sentence.

(b)    Payment of Taxes.

(i)    The Pre-Closing Holders will be responsible for any Taxes of the Company for any Pre-Closing Tax Period and that portion of a Straddle Tax Period that ends on the Closing Date.

(ii)    Taxes for any Straddle Tax Period will be allocated: (i) in the case of Taxes based on capitalization, debt or shares of stock authorized, issued or outstanding, or ad valorem Taxes, the portion of such Taxes allocated to the period ending on the Closing Date will be deemed to be the amount of such Tax for the entire taxable period, multiplied by a fraction the numerator of which is the number of days in the taxable period ending on and including the Closing Date and the denominator of which is the number of days in the entire taxable period, and (ii) in the case of any other Tax, the portion of such Taxes allocated to the period ending on the Closing Date will be determined on the basis of an interim closing of the books as of the end of the Closing Date.

(iii)    Purchaser will pay sales, use, stamp, documentary, real estate, personal property or other transfer Taxes payable as a result of the consummation of the transactions contemplated hereby.  Purchaser will file, or cause to be filed, all necessary documentation and Tax Returns with respect to such Taxes.

(c)    Contest Provisions.  Notwithstanding anything to the contrary contained in Section 6.4(a):

(i)    Purchaser will promptly notify the Holder Representative in writing upon receipt by Purchaser, any of its Affiliates or, after the Closing Date, the Company of notice of any pending or threatened Tax audits, inquiries or assessments, or other Legal Proceedings relating to Tax liabilities of the Company for which the Purchaser Indemnified Parties may be entitled to indemnification under Section 8.1 (a "Tax Contest Claim"); provided, however, that the failure or delay by Purchaser to promptly provide notice of a Tax Contest Claim will not affect Purchaser's right to indemnification hereunder except to the extent the defense of such Tax Contest Claim is materially prejudiced thereby. Such notice will include a copy of the relevant portion of any correspondence received from the relevant Governmental Body.

27

(ii)    The Holder Representative will have the right to control the conduct of any Tax Contest Claim which relates to any Pre-Closing Tax Period, and to employ counsel of the Holder Representative's choice at its own cost, if the Holder Representative notifies Purchaser in writing of its intention to do so; provided, however, that the Holder Representative will keep Purchaser informed regarding the progress and substantive aspects of any Tax Contest Claim that it elects to control, Purchaser will be entitled at its expense to participate in any Tax Contest Claim that the Holder Representative elects to control and the Holder Representative will not compromise or settle any such Tax Contest Claim without obtaining Purchaser's prior written consent (which consent will not be unreasonably withheld, conditioned or delayed). If the Holder Representative does not elect to control the conduct of a Tax Contest Claim pursuant to this Section 6.4(c)(ii), then Purchaser will keep the Holder Representative informed regarding the progress and substantive aspects of such Tax Contest Claim.  The Holder Representative will be entitled (at the expense of the Pre-Closing Holders) to participate in such Tax Contest Claim and Purchaser will not compromise or settle any such Tax Contest Claim without obtaining the Holder Representative's prior written consent (which consent will not be unreasonably withheld, conditioned or delayed).

(iii)    Purchaser will have the right to control the conduct of any Tax Contest Claim which relates to any Straddle Tax Period.  Purchaser will keep the Holder Representative informed regarding the progress and substantive aspects of such Tax Contest Claim.  The Holder Representative will be entitled (at the expense of the Pre-Closing Holders) to participate in such Tax Contest Claim and Purchaser will not compromise or settle any such Tax Contest Claim without obtaining the Holder Representative's prior written consent (which consent will not be unreasonably withheld, conditioned or delayed).

(iv)    Purchaser will have the sole right to represent the Company's interests in any Tax audit, inquiry or assessment, or other administrative or court proceeding relating solely to Tax liabilities for which a Purchaser Indemnified Party is not entitled to indemnification under this Agreement and to employ counsel of Purchaser's choice at Purchaser's expense.  Purchaser will have the sole right to defend the Company with respect to any issue arising in connection with any Tax Contest Claim to the extent Purchaser shall have agreed in writing to forego any indemnification under this Agreement with respect to such issue.

(d)    Assistance and Cooperation.  After the Closing Date, each Stockholder, the Holder Representative and Purchaser will (and will cause their respective Affiliates to):

(i)    timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or file Tax Returns or other reports with respect to, Taxes described in Section 6.4(b);

(ii)    assist the other party in preparing any Tax Returns which such other party is responsible for preparing and filing in accordance with Section 6.4(a), and in connection therewith provide the other party necessary powers of attorney;

(iii)    cooperate fully in preparing for and conducting any audits of, or disputes with taxing authorities regarding, any Tax Returns of the Company and provide the other party with powers of attorney as necessary to comply with Section 6.4(c)(ii) or Section 6.4(c)(iii);

(iv)    make available to the other and to any Governmental Body as reasonably requested all information, records, and documents relating to Taxes of the Company; and

(v)    furnish the other with copies of all correspondence received from any Governmental Body in connection with any Tax audit or information request with respect to any such taxable period.

Notwithstanding the provisions of this Section 7.4(d), after the Closing Date and except as required by applicable law or an order of a Governmental Body, Purchaser will not (i) make, change or revoke any Tax election or (ii) change the Company's method of accounting without the written consent of the Holder Representative, which shall not be unreasonably withheld, conditioned or delayed, if either such action will give rise to an indemnification obligation of any Indemnifying Party.

Section 7.4    Release.

(a)    Release. Each Stockholder, on behalf of such Stockholder and each of such Stockholder's Affiliates, successors and assigns (individually, a "Stockholder Releasor" and collectively, "Stockholder Releasors"), effective as of the Closing, hereby releases and forever discharges, Purchaser, the Group Company, and each of their respective individual, joint or mutual, past and present Affiliates, successors and assigns (individually, a "Purchaser Releasee" and collectively, "Purchaser Releasees") from any and all obligations, Contracts, debts, liabilities and obligations that any Purchaser Releasee now has or has ever had in favor of any Stockholder Releasor, in each case, of any nature (whether absolute or contingent, asserted or unasserted, known or unknown, primary or secondary, direct or indirect, and whether or not accrued) arising contemporaneously with or before the Closing or on account of or arising out of any matter, cause or event occurring contemporaneously with or before the Closing, whether pursuant to their respective certificate of incorporation or by-laws (or comparable documents), any Contract or otherwise and whether or not relating to claims pending on, or asserted after, the Closing Date (collectively, the "Released Claims"), in each case, other than (i) any right of such Stockholder arising under this Agreement or any Transaction Document including claims arising hereunder or thereunder; (ii) to the extent Stockholder Releasor is an employee of any Group Company, any right of Stockholder Releasor to receive accrued but unpaid wages, salary, compensation, bonuses, accrued vacation and any other accrued but unpaid compensation and/or benefits (other than any equity-based compensation) owed to Stockholder Releasor in its capacity as a service provider to the Company, provided that any such amount has been included as a consolidated liability of the Company as set out in the definition of Net Working Capital, (iii) any right to indemnification, advancement of expenses, exculpation, or rights to benefit from applicable director and officer indemnification agreements, the Charter and Bylaws, or (iv) any claim that, as a matter of Applicable Law, cannot be released by private agreement.

(b)    Acknowledgement. Each Stockholder acknowledges that the Laws of many states (including Section 1542 of the California Civil Code) provide substantially the following: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY." Each Stockholder acknowledges that such provisions are designed to protect a party from waiving claims which it does not know exist or may exist. Nonetheless, each Stockholders agrees that, effective as of the Closing Date, such party shall be deemed to waive any such provision.

(c)    No Actions. Each Stockholder further agrees that it shall not, nor permit any Affiliate thereof to (i) institute a lawsuit or other legal proceeding based upon, arising out of, or relating to any of the Released Claims, (ii) participate, assist, or cooperate in any such proceeding, or (iii) encourage, assist and/or solicit any third party to institute any such proceeding.

29

(d)    Enforceability. The provisions of this Section 7.4 are intended to be for the benefit of, and shall be enforceable by, the Purchaser Releasees and each such Person's heirs, legatees, representatives, successors and assigns, it being expressly agreed that each such Person is an express third-party beneficiary of, is intended to benefit from, and may enforce its rights under this Section 7.4.

Section 7.5    Acknowledgement; Nondisclosure.

(a)    Each Stockholder acknowledges that as a result and as a part of such Stockholder's relationship with the Company (including as a result of the Stockholder's ownership of Company's shares), such Stockholder may have been afforded access to Confidential Information that could have an adverse effect on Purchaser, the Company and their businesses if it is disclosed or used for any purpose other than that for which it was intended (the "***Purpose***"), and that as a condition and inducement to Purchaser and the Merger Sub entering into this Agreement and as a condition to the consummation of the Merger, it is reasonable and necessary for each Stockholder to promise and agree, subject to the terms and conditions herein, not to disclose or use, other than for the Purpose, such Confidential Information.  Each Stockholder further acknowledges and agrees that the benefits provided to each Stockholder under this Agreement constitute good and sufficient consideration for the agreements and covenants in this Section 7.5.

(b)    Each Stockholder agrees and acknowledges that from and after the Closing, such Stockholder shall, and shall cause such Stockholder's respective Affiliates to, hold all of the Confidential Information in confidence and refrain from using any of the Confidential Information, *provided*, *however*, that (a) a Stockholder may disclose such information or terms if required to do so by applicable Legal Requirement, provided that such Stockholder, to the extent legally permitted, promptly notifies Purchaser in advance of disclosing such information and takes reasonable steps to minimize the extent of any such required disclosure; (b) each Stockholder may disclose such information or terms to his, her or its professional advisers and, if such Stockholder is not a natural person, to its Affiliates and its and their partners, members, managers, members, directors, officers, employees and representatives, in each case, who: (i) need to know such information; and (ii) agree to keep it confidential; (c) each Stockholder may disclose such information or terms to any Governmental Entity, court or arbitrator or other involved party (e.g., opposing counsel, expert witnesses) in connection with any dispute resolution proceedings, but in each case (x) only to the extent necessary to enforce such Stockholder's rights (including by defending against assertions by Purchaser) under this Agreement or a Transaction Document, as applicable and (y) only in accordance with the rules, regulations and other procedures to which such proceeding is subject.

SECTION 8
INDEMNIFICATION

Section 8.1    Indemnification of the Purchaser Indemnified Parties.  From and after the Closing, each Pre-Closing Holder shall severally, in accordance with the allocations set forth attributable thereto on the Closing Spreadsheet, but not jointly, indemnify and hold harmless the Purchaser Indemnified Parties from and against, and will be compensated, reimbursed and paid for, any and all Losses arising out of or relating to:

(a)    any inaccuracy in or breach of any representation or warranty set forth in Section 4 or Section 5;

(b)    any breach of any covenant, agreement or undertaking made by the Company in this Agreement;

(c)    the exercise of appraisal rights pursuant to the DGCL by any Pre-Closing Holders; and

30

(d)    any Taxes with respect to the Company that are attributable to (i) a Pre-Closing Tax Period or (ii) that portion of a Straddle Tax Period that ends on the Closing Date.

The Losses of the Purchaser Indemnified Parties described in this Section 8.1 as to which the Purchaser Indemnified Parties are entitled to indemnification are collectively referred to as "Purchaser Losses."

Section 8.2    Indemnification by Purchaser.  From and after the Effective Time, Purchaser will indemnify and hold harmless the Holder Indemnified Parties from and against all Losses arising out of or relating to:

(a)    any inaccuracy in or breach of any representation or warranty set forth in Section 6; and

(b)    any breach of any covenant, agreement or undertaking made by Purchaser or Merger Sub in this Agreement.

The Losses of the Holder Indemnified Parties described in this Section 8.2 as to which the Holder Indemnified Parties are entitled to indemnification are collectively referred to as "Holder Losses."

Section 8.3    Indemnification Procedure.

(a)    Promptly following receipt by an Indemnified Party of notice by a third party (including any Governmental Body) of any complaint, dispute or claim or the commencement of any audit, investigation, action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "Third-Party Claim"), such Indemnified Party will provide written notice thereof to the Indemnifying Party; provided, however, that the failure to so notify the Indemnifying Party will not limit the Indemnified Party's right to indemnification under this Section 8 unless, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-Party Claim.  The Indemnifying Party will have the right, upon written notice delivered to the Indemnified Party within 30 days thereafter assuming full responsibility for any Losses resulting from such Third-Party Claim, to assume the defense of such Third-Party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel.  The Indemnifying Party shall not be entitled to assume or maintain control of the defense of any Third Party Claim, to the extent (i) the Indemnifying Party does not deliver the notice referred to in this Section 8.3 within the time period set forth herein, (ii) the Third-Party Claim seeks an injunction or other equitable relief against the Indemnified Party, (iii) the Indemnifying Party has failed or is failing to actively and diligently prosecute or defend such Third Party Claim or (iv) such Third-Party Claim involves any criminal culpability or any admission of criminal wrongdoing, or any civil claim commenced by a Governmental Authority.  In the event, however, that the Indemnifying Party declines or fails to assume the defense of such Third-Party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such 30-day period, then any Losses will include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-Party Claim for which indemnification is being sought hereunder, the Indemnified Party or the Holder Representative, whichever is not assuming the defense of such Third-Party Claim, will have the right to participate in such matter and to retain its own counsel at such Person's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) will at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter the defense of which it is maintaining and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    The Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-Party Claim or consent to the entry of any judgment with respect to

31

which indemnification is being sought hereunder unless such settlement, compromise or consent (i) includes an unconditional release of the Indemnified Party and its officers, directors, employees and Affiliates from all liability arising out of, or related to, such Third-Party Claim, (ii) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of the Indemnified Party or any of the Indemnified Party's Affiliates, and (iii) does not contain any equitable order, judgment or term that in any manner affects, restrains or interferes with the business of the Indemnified Party or any of its Affiliates.

(c)     If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third Party Claim (a "Direct Claim"), such Indemnified Party will send written notice of such claim to the Indemnifying Party (a "Notice of Claim").  Such Notice of Claim will specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party will not limit the Indemnified Party's right to indemnification with respect to any Direct Claim made pursuant to this Section 8.3(c) unless, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-Party Claim.  In the event the Indemnifying Party does not notify the Indemnified Party within thirty (30) days following its receipt of such Notice of Claim that the Indemnifying Party disputes the Indemnified Party's right to indemnification under this Section 8 or the amount thereof, the Indemnified Party will be conclusively entitled to the amount set forth in such Notice of Claim.  In the event the Indemnifying Party has timely disputed the Indemnified Party's right to indemnification under this Section 8 or the amount thereof, the Indemnified Party and the Indemnifying Party will, as promptly as reasonably practicable, establish the merits and amount of such Direct Claim (by mutual agreement, litigation or otherwise).

(d)     The Purchaser Indemnified Parties shall seek recovery with respect to any claim for indemnification pro rata based on each such Pre-Closing Holder's Pro Rata Share, in the form of (1) forfeiture of any right to receive Final Payment Amounts (as defined in the Bonus Agreement); (2)  for a period of eighteen (18) months after the Closing, surrender of Closing Shares with the number of such Closing Shares to be surrendered calculated using the Purchaser Share Price at the time of surrender; (3)  after such date or to the extent that that Pre-Closing Holder no longer has that number of Closing Shares, monetary payment by that Pre-Closing Holder; or (4) other legally recognized remedies.  Any such surrendered Closing Shares will revert back to the Purchaser.

Section 8.4     Survival Period.  The representations and warranties made by the Company, Stockholders, Purchaser and Merger Sub herein will not be extinguished by the Closing, but will survive the Closing for, and all claims for indemnification in connection therewith must be asserted not later than, 18 months following the Closing Date; *provided,* that each Holder Fundamental Representation and Purchaser Fundamental Representation will survive the Closing until, and all claims for indemnification in connection therewith must be asserted not later than, the expiration of the applicable subject matter statute of limitations applicable to such claim.  Notwithstanding the foregoing, if, prior to the close of business on the last day a claim for indemnification may be asserted hereunder, the Indemnifying Party shall have been properly notified of a claim for indemnity hereunder and such claim shall not have been finally resolved or disposed of at such date, such claim will continue to survive and will remain a basis for indemnity hereunder until such claim is finally resolved or disposed of in accordance with the terms hereof.  The covenants and agreements of the parties hereunder will survive without limitation as to time, and the period during which a claim for indemnification may be asserted in connection therewith will continue indefinitely.

Section 8.5     Limitations.

(a)     Notwithstanding anything in this Section 8 to the contrary, no Purchaser Indemnified Party will be entitled to indemnification for any Purchaser Losses until the aggregate of all such indemnifiable Purchaser Losses exceeds in total $25,000, in which case the Purchaser Indemnified Parties will be entitled to indemnification pursuant to Section 8.1(a) for all Purchaser Losses, including the initial $25,000

provided, however, that the limitations set forth in this Section 8.5 will not apply to any claim arising out of or related to Fraud or a breach of any of the representations and warranties contained in Section 4.1 (Organization and Capacity), Section 4.2 (Authority and Enforceability), Section 4.3 (Title to Shares), Section 4.4 (No Conflict), Section 5.1 (Organization; Standing and Power; Subsidiaries), Section 5.2 (Authority; Enforceability; Company Action), Section 5.4 (Capitalization), Section 5.9 (Intellectual Property), Section 5.13 (Tax Matters) or Section 5.18 (Brokers, Finders and Investment Bankers) (collectively, the "Holder Fundamental Representations"). No Indemnifying Pre-Closing Holder shall be liable pursuant to Section 8.1(a) for amounts in excess of the Merger Consideration received by such Indemnifying Pre-Closing Holder (based on the Purchaser Share Value) plus the Final Payment Amounts under such Indemnifying Pre-Closing Holder's Bonus Agreement except in the event of Fraud by the Company or such Indemnifying Pre-Closing Holder.

(b)      Notwithstanding anything in this Section 8 to the contrary, no Holder Indemnified Party will be entitled to indemnification for any Holder Losses until the aggregate of all such indemnifiable Holder Losses exceeds in total $25,000, in which case the Holder Indemnified Parties will be entitled to indemnification pursuant to Section 8.2 for all Holder Losses, including the initial $25,000 provided, however, that the limitations set forth in this Section 8.5 will not apply to any claim arising out of or related to Fraud or a breach of any of the representations and warranties contained in Section 6.1 (Organization; Standing and Power), Section 6.2 (Authority; Enforceability; Company Action), and Section 6.4 (Finders' Fees) (collectively, the "Purchaser Fundamental Representations" and together with the Holder Fundamental Representations, the "Fundamental Representations"). Purchaser and Merger Sub collectively shall not be liable for amounts in aggregate in excess of the Merger Consideration (based on the Purchaser Share Value) plus the Final Payment Amounts under the Bonus Agreements except in the event of Fraud by Purchaser or Merger Sub.

Section 8.6      Investigations. The rights of a Holder Indemnified Party or Purchaser Indemnified Party to indemnification or any other remedy under this Agreement shall not be impacted or limited by any knowledge that such party may have acquired, or could have acquired, whether before or after the closing date, nor by any investigation or diligence by or on behalf of such party. The Company and Stockholders hereby acknowledge that, regardless of any investigation made (or not made) by or on behalf of the Purchaser, and regardless of the results of any such investigation, the Purchaser has entered into this transaction in express reliance upon the representations and warranties of the Seller made in this Agreement. Purchaser and Merger Sub hereby acknowledge that, regardless of any investigation made (or not made) by or on behalf of the Company or Pre-Closing Holders, and regardless of the results of any such investigation, the Company and Pre-Closing Holders have entered into this transaction in express reliance upon the representations and warranties of the Purchaser and Merger Sub made in this Agreement.

Section 8.7      Materiality. Notwithstanding anything contained herein to the contrary, for purposes of determining whether there has been a breach of a representation and for purposes of determining the amount of Losses that are the subject matter of a claim for indemnification or reimbursement hereunder, each representation and warranty in this Agreement and the Company Disclosure Schedule will be read without regard and without giving effect to the terms "material" or "Material Adverse Effect" or similar phrases contained in such representation or warranty.

Section 8.8      Exclusive Remedy. The parties agree that, excluding actions grounded in Fraud, from and after the Closing Date, the indemnities provided in this Section 8 will constitute the sole and exclusive remedy of any Indemnified Party for damages arising out of, resulting from or incurred in connection with any claims related to this Agreement or arising out of the transactions contemplated hereby; provided, however, that this exclusive remedy for damages does not preclude a party from bringing an action for specific performance or other equitable remedy to require a party to perform its obligations under this Agreement or any agreement entered into in connection herewith.

Section 8.9     Merger Consideration Adjustment.  The parties agree that any indemnification payment made pursuant to this Agreement shall be treated as an adjustment to the Merger Consideration for Tax purposes, unless otherwise required by Law.

Section 8.10     Insurance.  All indemnifiable Losses shall be calculated net of the amount of any recoveries actually received by a Purchaser Indemnified Party under any insurance policies and contractual indemnification or contribution provisions (in each case, calculated net of any actual collection costs and reserves, expenses, or deductibles) in respect of any indemnifiable Losses suffered, paid, sustained or incurred by any Purchaser Indemnified Party.

Section 8.11     Good Faith; Mutual Cooperation.  The Indemnifying Party and the Indemnified Party shall reasonably cooperate with each other with respect to resolving any claim or liability with respect to which an Indemnifying Party is allegedly obligated to indemnify an Indemnified Party hereunder. The Indemnified Party shall use all reasonable best efforts to mitigate Losses and resolve any such claim or liability. In the event that an Indemnified Party fails to make such reasonable best efforts to mitigate or resolve any such claim or liability, then notwithstanding anything else to the contrary contained in this Agreement, the Indemnifying Party shall not be required to indemnify the Indemnified Party for any Losses that would reasonably be expected to have been avoided if the Indemnified Party had made such efforts.

SECTION 9
MISCELLANEOUS PROVISIONS

Section 9.1     Holder Representative.

(a)     The parties agree that it is desirable to designate a representative to act on behalf of the Pre-Closing Holders with respect to all matters arising under this Agreement.  The Pre-Closing Holders have designated Robert Nessler as the initial Holder Representative, and adoption of this Agreement by the Company Stockholder Approval will constitute ratification and approval of such designation.  The Holder Representative may resign at any time, and may be removed by the vote of Persons which collectively owned more than 50% of the Participating Shares immediately prior to the Effective Time; provided, however, that any such removal will not be effective unless and until a successor Holder Representative reasonably acceptable to Purchaser has been appointed and accepts such position and the terms hereof.

(b)     The Holder Representative will have such powers and authority as are necessary to carry out the functions assigned to it under this Agreement; provided, however, that the Holder Representative will have no obligation to act on behalf of the Pre-Closing Holders, except as expressly provided herein, and for purposes of clarity, there are no obligations of the Holder Representative in any ancillary agreement, schedule, exhibit or the Company Disclosure Schedule.  Without limiting the generality of the foregoing, the Holder Representative will have full power, authority and discretion to (i) act according to the terms of this Agreement in the absolute discretion of the Holder Representative, (ii) represent the Pre-Closing Holders and their respective successors and assigns with respect to all matters arising under this Agreement, including, after the Closing, to negotiate and enter into amendments to this Agreement for and on behalf of the Pre-Closing Holders and make all decisions required or allowed to be made by the Holder Representative pursuant to the provisions hereof and thereof (including the right to defend, settle, compromise or take any other action with respect to any matter for which Indemnified Parties seek indemnification under Section 8) and (iii) in general to do all things and to perform all acts, including executing and delivering any agreements, certificates, receipts, instructions, notices or instruments contemplated by or deemed advisable in connection with this Agreement.  Each Pre-Closing Holder, by virtue of the adoption of this Agreement by the Company Stockholder Approval, (x) agrees that all actions taken by the Holder Representative under this Agreement will be binding upon such Pre-Closing Holder and such Pre-Closing Holder's successors and assigns as if expressly confirmed and ratified in writing by

34

such Pre-Closing Holder, (y) waives any and all defenses which may be available to contest, negate or disaffirm the action of the Holder Representative taken in good faith under this Agreement and (z) grants the Holder Representative full power and authority to interpret all the terms and provisions of this Agreement and to consent to any amendment hereof or thereof on behalf of such Pre-Closing Holder and its successors and assigns.  The Holder Representative will be entitled to engage such counsel, experts and other agents and consultants as it deems necessary in connection with exercising its powers and performing its function hereunder and (in the absence of bad faith on the part of the Holder Representative) will be entitled to conclusively rely on the opinions and advice of such Persons.

(c)     The Holder Representative shall not be liable to any Pre-Closing Holder for any act done or omitted hereunder as the Holder Representative while acting in good faith (and any act done or omitted pursuant to the advice of counsel shall be conclusive evidence of such good faith) and without gross negligence or willful misconduct.  The Pre-Closing Holders shall severally but not jointly indemnify the Holder Representative and hold it harmless against any Holder Allocable Expenses incurred without gross negligence, willful misconduct or bad faith on the part of the Holder Representative and arising out of, resulting from or in connection with the acceptance or administration of its duties hereunder or under the Holder Representative Engagement Agreement, including all reasonable out-of-pocket costs and expenses and legal fees and other legal costs reasonably incurred by the Holder Representative.  If not paid directly to the Holder Representative by the Pre-Closing Holders, Holder Allocable Expenses may be recovered by the Holder Representative from the Pre-Closing Holders according to their respective Pro Rata Shares of such Holder Allocable Expenses.  The immunities and rights to indemnification shall survive the resignation or removal of the Holder Representative and the Closing and/or any termination of this Agreement.

(d)     The Holder Representative shall be entitled to: (i) rely upon the Closing Spreadsheet, (ii) rely upon any signature believed by it to be genuine, and (iii) reasonably assume that a signatory has proper authorization to sign on behalf of the applicable Pre-Closing Holder or other party. The powers, immunities and rights granted to the Holder Representative hereunder: (i) are coupled with an interest and shall be irrevocable and survive the death, incompetence, bankruptcy or liquidation of any Pre-Closing Holder and shall be binding on any successor thereto, and (ii) shall survive the delivery of an assignment by any Pre-Closing Holder of the whole or any fraction of his, her or its interest in the Holdback Shares.

(e)     If the Holder Representative takes any action that adversely affects a Pre-closing Holder differently relative to the other Equity Holders, such differently affected Pre-closing Holder shall have the right to approve such action in writing prior to the Holder Representative's taking thereof.

Section 9.2     Further Assurances.  Each party hereto will execute and cause to be delivered to each other party hereto such instruments and other documents, and will take such other actions, as such other party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.

Section 9.3     Fees and Expenses.  Except as otherwise expressly set forth herein, each party to this Agreement will bear and pay all fees, costs and expenses (including legal fees and accounting fees) that have been incurred or that are incurred by such party in connection with the transactions contemplated by this Agreement; provided, however, that the Pre-Closing Holders will be responsible for all Company Transaction Expenses. Notwithstanding the foregoing, if the Closing occurs prior to midnight PST, March 11, 2024, then at the Closing, Purchaser shall pay the reasonable fees and expenses of Foster Law Group, counsel for the Company, in an amount not to exceed, in the aggregate, $27,500.

Section 9.4     Waiver; Amendment.  Any agreement by a party to any extension or waiver of any provision hereof will be valid only if set forth in an instrument in writing signed on behalf of such party.  A waiver by a party of the performance of any covenant, agreement, obligation, condition, representation

or warranty will not be construed as a waiver of any other covenant, agreement, obligation, condition, representation or warranty. A waiver by any party of the performance of any act will not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time. This Agreement may not be amended, modified or supplemented except by written agreement of the parties.

Section 9.5    Entire Agreement. This Agreement (together with the Schedules and Exhibits hereto) constitutes the entire agreement among the parties to this Agreement and supersedes all other prior agreements and understandings, both written and oral, among or between any of the parties with respect to the subject matter hereof and thereof.

Section 9.6    Execution of Agreement; Counterparts; Electronic Signatures.

(a)    This Agreement may be executed in several counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument, and will become effective when counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterparts.

(b)    The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, will constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

Section 9.7    Governing Law; Jurisdiction and Venue.

(a)    This Agreement will be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware (without giving effect to principles of conflicts of laws).

(b)    Any legal action or other Legal Proceeding relating to this Agreement or the enforcement of any provision of this Agreement will be brought or otherwise commenced exclusively in any state or federal court located in the County of New York, State of New York. Each party to this Agreement:

(i)    expressly and irrevocably consents and submits to the jurisdiction of each state and federal court located in the County of New York, State of New York (and each appellate court located in the State of New York), in connection with any Legal Proceeding;

(ii)    agrees that service of any process, summons, notice or document by U.S. mail addressed to her, him or it at the address set forth in Section 9.11 will constitute effective service of such process, summons, notice or document for purposes of any such Legal Proceeding;

Section 9.8    WAIVER OF JURY TRIAL. EACH OF THE PARTIES IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

Section 9.9    Assignment and Successors. No party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other parties, except that Purchaser may assign any of its rights and delegate any of its obligations under this Agreement to any

36

Affiliate of Purchaser.  Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the parties.

Section 9.10    Parties in Interest.  Except for the provisions of Section 8, none of the provisions of this Agreement is intended to provide any rights or remedies to any Person other than the parties hereto and their respective successors and assigns (if any).

Section 9.11    Notices.  All notices, consents, waivers and other communications required or permitted by this Agreement will be in writing and will be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); or (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a), in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by notice to the other parties); provided that with respect to notices deliverable to the Holder Representative, such notices shall be delivered solely via email or facsimile:

**Company (before the Closing):**

VoiceBite Corporation
1149 Hollyhead Lane
Cupertino, California  95014
Attention: Robert Nessler, Chief Executive Officer
E-mail address: robert@voicebite.ai

**Any Stockholder:**

To the address set forth on the Stockholder's signature page hereto.

**Holder Representative (on its own behalf and for the benefit of the stockholders of the Company):**

Robert Nessler
1149 Hollyhead Lane
Cupertino, California  95014
E-mail address: robert@voicebite.ai

**Purchaser and Merger Sub:**

Checkmate.com Inc.
1113 York Ave, #36E
New York, NY  10065
Attn: Vishal Agarwal
Email:  vishal@itsacheckmate.com

with a mandatory copy to (which copy will not constitute notice):

DJL Corporate Law
17349 Parkside Court
Monte Sereno, CA  95030
Attention:  Todd Murtha

Email:  todd@djlcorplaw.com

Section 9.12    <u>Enforcement of Agreement</u>.  The parties acknowledge and agree that Purchaser and Merger Sub would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any breach of this Agreement by the Company could not be adequately compensated in all cases by monetary damages alone.  Accordingly, in addition to any other right or remedy to which Purchaser or Merger Sub may be entitled, at law or in equity, it will be entitled to enforce any provision of this Agreement by a decree of specific performance and temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

Section 9.13    <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

Section 9.14    <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 9.15    <u>Schedules and Exhibits</u>.  The Schedules and Exhibits (including the Company Disclosure Schedule) are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full herein.  Each disclosure set forth in the Company Disclosure Schedule is identified by reference to, or has been grouped under a heading referring to, a specific individual section or subsection of this Agreement and relates only to such section or subsection; provided, however, that notwithstanding the foregoing, any matter disclosed in a Section of the Company Disclosure Schedule will be deemed to be disclosed in any Section contained in the Company Disclosure Schedule, to the extent that it is reasonably apparent from such disclosure that such disclosure is applicable to such other Section.

*      *      *

DocuSign Envelope ID: B5C6BBF2-BA76-4B1B-A92B-5F536C89A17E

The parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

PURCHASER:

**CHECKMATE.COM INC.**

By: _____

Name: Vishal Agarwal

Title: _____

MERGER SUB:

**VOICEBITE MERGER SUB, INC.**

By: _____

Name: Vishal Agarwal

Title: _____

COMPANY:

**VOICEBITE CORPORATION**

By: _____

Name: _____

Title: _____

HOLDER REPRESENTATIVE:

_____

**ROBERT NESSLER**

SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER

The parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

PURCHASER:

**CHECKMATE.COM INC.**

By: _____
Name: _____
Title: _____

MERGER SUB:

**VOICEBITE MERGER SUB, INC.**

By: _____
Name: _____
Title: _____

COMPANY:

**VOICEBITE CORPORATION**

By: _____
Name: __Robert Nessler_____
Title: __CEO_____

HOLDER REPRESENTATIVE:

_____
**ROBERT NESSLER**

SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER

The parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

**STOCKHOLDERS:**

**ROBERT NESSLER**

Address: 1149 Hollyhead Lane
Cupertino CA, 95014

Email Address: rob@voicebite.ai

**ARJUN VASAN**

Address: 12615 193rd St
Cerritos, CA 90703

Email Address: arj@voicebite.ai

**CHRISTOPHER LAM**

Address: 9 Lamay Crescent
Toronto, Ontario, M1X 1J2, Canada

Email Address: chris@voicebite.ai

**ISAMU AOKI**

Address: 502 Morse St
San Jose CA 95126

Email Address: sam@voicebite.ai

**PAUL JUSTIN GARCIA**

Address:

Email Address:

SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER

The parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

**STOCKHOLDERS:**

_____

**ROBERT NESSLER**

Address:

Email Address:

_____

**ARJUN VASAN**

Address:

Email Address:

_____

**CHRISTOPHER LAM**

Address:

Email Address:

_____

**ISAMU AOKI**

Address:

Email Address:

_____

**PAUL JUSTIN GARCIA**

Address: 1395 Saratoga Ave 13 l
San Jose, CA 95129

Email Address: paul@voicebite.ai

SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER

**Schedule 2.3(b)(vi)**

**Restrictive Covenant Agreement Parties**

**Robert Nessler**

**Arjun Vasan**

**Christopher Lam**

**Schedule 2.3(b)(viii)**

**Employment Offer Letter Parties**

**Robert Nessler**

**Arjun Vasan**

**Schedule 2.3(b)(viii)**

**Consulting Agreement Parties**


**Christopher Lam**

**Schedule 2.3(b)(ix)**

**Retention Bonus Agreement Parties**

**Robert Nessler**

**Arjun Vasan**

**Christopher Lam**

**Isamu Aoki**

**Paul Justin Garcia**